## BULLOCK *versus* WILSON.

The duplicate receipt of the Receiver of public monies (on an entry of public lands) is, before the issuance of the patent thereon, sufficient evidence of title to authorise the *bona fide* holder of the same, to maintain the action of trespass to try title.

Every water course in this State, suited to the ordinary purposes of navigation, whether it ebbs and flows, or *not,* (where the government has not expressly granted any part of the bed thereof, or computed it in the quantity granted) is a public highway; and the owner of lands bounded by any such naviga‐ ble stream, can assert no private right of soil to the bed of the river beyond the low water mark.

*Semble:*—The authority, under an act of the Legislature to erect a mill on such water course, must be exercised with reference to the rule, *sic utere tuo, ut alienum non lædas..*

Trespass to try title in the Circuit Court of Shel‐ by, by Wilson against Bullock.

The action was brought to recover possession of a fraction of land, and the appurtenances, bounded by the Coosa river. On the trial below, a verdict was rendered in favor of the plaintiff, and on certain ex‐ ceptions to the opinions of the Court, the defendant assigned errors here.

It appeared from the record, that Wilson had en‐ tered the fraction of land, forming the ground of ac‐ tion; and now claimed as appurtenant thereto, a cer‐ tain mill, before that time erected in the bed of the river, opposite the fraction, by one Sawyer, under whom the defendant held.

It was urged, on the part of the plaintiff, that hav‐ ing become the owner of the land on the river, he took part of the bed of the river; and so was entitled to the mill, because, that being included between the North and South lines of his survey, attached to his grant. But it was said for the defendant, that Sawyer, under whom defendant held, had erected the

mill under the authority of an act of the Legislature, and the subsequent entry of the land by the plaintiff was subject to the privilege : also, that this being a navigable river, the plaintiff could not claim soil beyond the high water mark.

It was assigned for error in this Court, among other grounds,

1st. That the Court permitted the plaintiff to give to the jury, as his only evidence of title, the duplicate receipt of the receiver of public monies in the land office.

2d. That the Court charged the jury, that if they were satisfied from the testimony, that the mill attached in any manner to the land included in plaintiff's grant, it was appurtenant to his premises, and therein included.

Wilson, for Plaintiff in error.—The mill, in regard to which there is a contest, belongs, as we contend, to the body of the river. The Court instructed the jury, that if the mill was in any manner attached to the bank, the owner of the land was entitled to it. This was a navigable stream. The limits of a navigable stream extend to high water mark. The lines of fractional sections have not the power of locomotion—or rather of expansion and contraction, to conform themselves to the state of the water. The owner of the mill derives his right from the State. The proof in this case shews, that even at low water mark, the water ran round and on the out side of the foundation timbers of the mill. According to the civil law, the limits of a navigable stream extended out to the extent of the highest freshets: according to our law they extend to *ordinary high water mark.*—See 2 *Johnson,* 362.

The Court seems to have departed from the maxim of the Common Law, that the man who owns land owns all that is above and below, within the limits of his lines. The doctrine of the Court seems to be, that he owns all that is attached to his lines. This is extending the rule laterally instead of perpendicularly. In this new sense, I trust, it will not be recognised as law.

The certificate in this case is not one of those referred to in the act of Assembly, making certificates evidence. There was not, therefore, such evidence of title as would sustain ejectment.

PECK, *contra.*—The certificate is such an one as entitles the party to a patent: it is therefore such evidence of title as will sustain the action.

Bullock built his mill abutting against the bank. The Common Law rule is, that there is no space between the land and the water.—6 *Cowen,* 544. And we find it laid down as Common Law in *Cowen,* that the owners of the land own to the thread or centre of the river. This is true limit for land holders in streams not navigable; and navigable streams, according to the Common Law, are not such as the Coosa river, but streams where the tide ebbs and flows. In navigable streams of this kind, the limits of land holders extend to low water mark, so that there is still no land between the land holder and the government, whose authority extends over the water. The Court is referred to the Kentucky and Ohio case, where the contest related to an island in the Ohio river.—5 *Wheaton,* 325.

What is meant in our laws by declaring a stream a public highway. It does not relate to the bed of the stream, but to the right to float over it on the wa-

ter : it is a peculiar kind of right of way.   The bed of the river still belongs to the land owners on each side, to the middle or thread of such river.   The Judge did not go as far as this.   He charged the jury that the grant covered the land as far as there be land.   The charge was clearly right.   He also charged the jury that if the mill was attached to the bank, the owner of the land had a right to recover it as a tenement or appurtenance.   This doctrine also may be well maintained, even if the right of the land holder does not extend to the thread of the stream.— When the United States government grants land on the bank of a river, it grants all the water privileges connected with it.   These are often as important as the value of the soil.   The reservation of the stream as a highway, is not a reservation belonging to the state : it is a reservation by the general government in behalf of the citizens of the United States ; the State, therefore, has no such right in it as would authorise it to grant to any one the privilege of erecting a mill on the bed of the river.

WILSON, in reply.—If the doctrine here contended for be true, it might be important to know whether the action was brought in the winter or in the summer.   This doctrine makes the line fluctuating.   If a part of the mill overhangs the land, damages might be recovered for such overhanging; but not the value of the mill which was founded in the bed of the river.

Our lands in this State stand on a different footing from those in other States in regard to the rivers on which they border.   The navigable streams are made public highways, and they do not belong to the land owners upon their banks.   The State, although

she may not obstruct the navigation ; yet in virtue of eminent domain, she may use or grant the bed for any other purpose. She possesses all the authority not granted away. Land owners only border on the bank, and the State is only restrained as to the navigation. The mill was erected under an express grant from the Legislature. Can the entry by an individual of the adjoining land, enable the enterer to nullify the act of Assembly establishing the mill? Can he deprive the mill owner of the privilege that he had under the legislative grant?

By Mr. Chief Justice SAFFOLD:

The action was *trespass* to try titles, and recover damages, instituted by the defendant in error, pursuant to the statute, in lieu of the action of ejectment, &c. The land in dispute, as described in the declaration, is the south east fraction of section number seven, in township twenty one, of range two, east, containing one hundred and forty five acres, in the county of Shelby. The trial was had on the general issue. The matters assigned for errors grew out of a bill of exceptions taken on the trial by Bullock the defendant below, against whom a verdict and judgment were had for the premises; also, for damages.

The first point of exception is, that the Court sanctioned an amendment of the declaration, made between the time of ordering a *non-suit*, and *reinstating* the cause, without due notice to the defendant below, and formal leave of the Court. The Court appears to have ruled that the leave was sufficiently implied by the order setting aside the *non-suit*, on the affidavit on which it was founded.

As to this objection, it is sufficient to say, the allowance of amendments, is generally within the dis-

cretion of the Court, and as the Circuit Court recognised the authority for this amendment, the allowance of it is not subject to revision in error.

It further appears, that after the cause was put to the jury, the plaintiff below offered as his only evidence of title, a receipt (purporting to be in duplicate) in the usual form under the cash system of disposing of the public lands, given by the receiver of public monies of the land district, to James Wilson of Bibb county, for the sum of one hundred and eighty one dollars and twenty five cents, expressing to be in full for the fraction of land described in the declaration. To the introduction of which, as evidence of title, the defendant objected, but the objection was overruled.

In admitting this receipt as evidence, the Court is also charged to have erred. The objection is understood to have been made with reference alone to the *grade* of interest or title indicated by the paper, without questioning its *genuineness;* and this in the absence of any evidence of an adverse title. I consider it unnecessary to enter into an elaborate investigation of the principles of law applicable to this point; they are too well settled to require it. By the laws of the United States, the legal and *bona fide* holder of a receipt of this kind, is indefeasibly entitled to a patent for the same. Nothing more is necessary on his part to secure it. He already has a legal right— the receipt and the law, imperatively command the issuance of the patent as the complete evidence of the title. Until it shall have issued, the receipt is the best evidence of the right which the case admits of. This receipt is fully within the equity of the statute of 1812,[a] which recognises all certificates issued pursuant to any act of Congress, upon any warrant or or- [a]Aik. Dig, 283.

der of survey, or to any donation, or pre-emption claim-
ants of lands, as vesting in the holders "a full, complete
and legal title," so far as to enable them to maintain any
action thereon; and constitutes the same evidence
thereof in Courts of justice. So far as there is any dif-
ference in the character of the evidence, or grade of ti-
tle, a receipt of this kind is the more conclusive. But
I do not consider receipts of this nature as requiring
the aid of any statute.    Upon the principles of the
Common Law, they must be regarded as evidence of
a grade of title which at least confers the right of pos-
session, and this alone is sufficient in this action.    But
it is more : it is nothing less than inchoate evidence
of an absolute title.    Various decisions of this and
other Courts, (*De la Croix* vs. *Chamberlain*,[a]) sustain
this principle in terms or by analogy.—(See *Hallett*
vs. *Eslava*,[b] *Lewis* vs. *Goquette*,[c] *Heirs of Rider* vs.
*Innerarity*.[c])    It was further objected by Bullock as
defendant below, that the county surveyor was admit-
ted as a witness for the plaintiff, and his evidence deem-
ed *competent* by the Court, to ascertain the boundaries
of the land in question.    He swore that by tracing
various lines by the marked trees, he ascertained the
north west corner of the fraction, which was not mark-
ed ; he then ran due south on both the sectional and
township lines to the south west corner, which he as-
certained by taking the bearings and distances ; that
then he ran the south line to the south east corner,
but found no marked corners.    From this latter point
he ascertained, by setting his compass, and observa-
tions taken, that a line due north would strike the
Coosa river below the mill : that he then retraced his
line half a mile west, thence run due north half a
mile, thence east to the river above the mill ; and
that in this way he ascertained the mill to be between

[a] 12 Wheat. 599

[b] 2 Stewart 115

[c] In this Court.

the north and south boundaries of the plaintiff's fraction, and that opposite and for some distance above and below the mill, the fraction was bounded on the east by the river.

On this point it is considered sufficient to say, the character of the evidence was equal to any that the case would admit of, and was therefore competent.

Another feature in the case is, that Sawyer, under whom Bullock derived his title to the mill, had erected the same in the river, under the authority of an act of the General Assembly of the State; that this was a considerable time before Wilson became the purchaser of the fraction opposite; that the mill stood in the bed of the river; except that a little of the bank had been cut away, to make room for the north and south mud sills to be laid in it on a level with the bed of the river; that the west sill, or streamer being laid upon these sills, the current of the river ran around them, between them and the bank; that the bluff of the river was nearly perpendicular, so as to confine the water, except in extraordinary freshets; that about five feet of the upper frame of the millhouse projected over the top of the bluff, but without touching it; and that the puncheons passing from the mill door down to the bluff, were about twelve feet long. This invasion upon the land, or use of the bluff, appears to be the true grievance complained of.

In this state of the evidence, the Court being requested to instruct the jury on the several points of law arising upon the facts, and having refused some and given others, the following additional questions are presented for our consideration, as embracing all the remaining points of the case.

I. Admitting Wilson's title to the fraction bounded on the east by the Coosa river, what was the extent of his right or boundary on the margin of the river ; does he own all the naked land to the water mark, whether high or low, as was the opinion of the Circuit Judge ?

II. Was it erroneous to instruct the jury, that, if the mill was in any manner attached to the plaintiff's bank, it was an appurtenant to the premises ; and included in his grant ; also that the plaintiff was entitled to recover damages for the use of it ? These latter instructions were given.

III. Was the Circuit Court correct in refusing instructions that the verdict should except the mill out of the land if the latter were found for the plaintiff, and not the former also ?

IV. Did the Court err in refusing instructions, that if the mill had been previously erected, abutting on the bank, under the authority of the State law, and this known to Wilson when he entered the land; he entered subject to the nuisance, if any, and was remediless ?

1. The fact may be assumed, indeed does not appear to have been contested on the trial, that the Coosa river at the point in question, is a fresh water, navigable stream. Nor do I understand the principle to be contested, that by the existing laws of the government all such streams are recognised as common or *public highways.* The act of Congress of 1803, "Regulating the grants of lands, and providing for the disposal of the lands of the United States, south of the State of Tennessee," declares, that "all navigable rivers within the territories of the United States south of the State of Tennessee, shall be deemed to be and remain public highways." The subsequent

act of 1819, continued this provision under the State government, with the further stipulation, that all such waters shall remain free to the citizens of the State and of the United States, without any tax, duty, impost, or toll therefor, imposed by the State.[a] To these regulations, the people of the State, by their representatives, in Convention assembled, have given their assent and confirmation.[b]

ᵃAik. Dig. 441

ᵇOrdin'ce 1819

The Legislature of the State has also declared that all water courses reported to be navigable, by the surveyor of the United States, employed in surveying lands in this State, shall be, and remain free and open.[c]

ᶜAik. Dig. 442

According to the laws and practice of the United States government, relating to the surveys and sale of the public domain, the Coosa, as well as other similar water courses, is virtually excepted from all private grants. The lines of the survey stop at the margin of the river, by which means, fractions (as in the case before us) are created; and the purchasers of such are only charged for the true quantity of land, the bed of the river being excluded. In respect to grants of lands bounded by water courses, where there is no statute regulation on the subject, or express exception in the grant, intricate and highly interesting questions may arise as to the extent of the proprietor's right on the margin. In such cases, the character of the water, whether the sea, a navigable river where the tide ebbs and flows, a fresh water navigable stream, or one not navigable, is material to be considered in determining the extent of the grant.

There has been much litigation, whether the right extends to the high, or low, or the ordinary water mark, or to the centre, (often called the thread) of the

river. Our chief concern at present, is with a navigable river, where the tide does not ebb and flow.

To the case of *Jennings, ex parte*,[a] the Reporter has appended a note, in which are collated most of the authorities on this subject. A brief notice of this, instead of the original cases, will suffice on the present occasion. It is there said to be settled by the Common Law,[b] " that where a man's land *abuts* or *adjoins* to any river above tide water, he owns the river to the centre of the stream. That as long ago as 1805, in *Palmer* vs. *Mulligan*,[c] it appearing that the defendant owned the shore of the *Hudson* as low down as still water, this being above tide water, *Thompson*, Justice, and *Kent*, Chief Justice, applied to this case the doctrine, (which had been held by Lord *Hale*,) that his ownership extended to the centre of that great river ; and the latter then hinted at what has since been established, that if a State will bound a grantee upon a river not navigable, he shall hold to the centre, *unless there be an exception of the river in the grant.* In *Adams* vs. *Pease*,[d] the plaintiff owned a large farm bounded east on *Connecticut river*, above the flowing of the tide ; but where it was large and passable for flat bottomed boats of thirty tons burthen ; and some times, vessels built above had been floated down ; yet it was held, that a boundary, in terms, *on the river* carried the plaintiff's ownership of the river to its centre. The rule is there laid down by *Swift*, Chief Justice, that the *adjoining proprietors* have this right. The doctrine of this latter case appears to have been approved in its full extent by the *Supreme Court of New-York*, in *Hooker* vs. *Cummings*,[e] where it was applied to the *Salmon* river, which empties into *Lake Ontario.*— *Spencer*, Chief Justice, in delivering the opinion of

*6 Cowen, 518.

*Idem, 544.

*3 Caines, 319.

*2 Conn. Rep. N. S. 481.

*20 Johns. 91.

the Court, said, " If the soil *on both sides* be owned by an individual, he has the sole and exclusive right; but if there be different proprietors on each side, they own their respective sides—*ad filum medium auquæ*. The Court then also approved what *Kent*, Chief Justice, said in *Palmer* vs. *Mulligan*, that the *Hudson* was private property down to *still water*. They also show that cases holding the contrary in *Pennsylvania*, are founded on a repudiation of the Common Law.[a]

[a] 17 John. 209, 210, &c.
[b] 1 Halst. N. J. Rep. 1.

In the case of *Arnold* vs. *Mundy*,[b] the plaintiff's land *ran to*, or was bounded *on a river*, where the tide did ebb and flow ; and he, and those under whom he claimed, had staked off, and planted a bed of *oysters*, some of which the defendant had taken away ; for which the action was brought. On a motion for a *non-suit*, the Judge remarked, " that a grant of land to a subject or citizen, *bounded on a fresh water stream, or river*, where the tide neither ebbs or flows, extends to the middle of the channel of the river ; but that a grant bounded on a *navigable river*, or other water, where the tide does ebb or flow, extends to the edge of the water only, that is to say, (in the language of the opinion before us,) " to high water mark, when the tide is high, and to low water mark, when the tide is low ; but it extends no farther." The plaintiff was there *non-suited* upon this distinction. On a motion to set aside the *non-suit*, the *Supreme Court*, after full investigation, confirmed the distinction and refused the motion. The principle which is considered to have been established by that Court is, that " a grant of land bounded upon a fresh water stream or river, where the tide neither ebbs or flows, extends *ad filum aquæ ;* but a grant bounded upon a navigable river extends to the edge of the water only.

From the cases referred to, it will be observed, that those Courts, proceeding on the Common Law, regard the *ebbing and flowing* of the water, or either, as the criterion, whether the stream or river be navigable or not; they also shew that fresh water streams were not put on the footing of such. This principle is farther illustrated by the case of *Storer* vs. *Freeman*,[a] where Chief Justice *Parsons*, remarked, that " by the Common Law of *England*, which our ancestors brought with them, claiming it as their birthright, the owner of land bounded on a fresh water river, owned the land to the centre of the channel of the river, as of common right; but if his land was bounded on the sea, or an arm of the sea, where the tide ebbed and flowed, he could not by such boundary, hold any land below the ordinary low water mark, for all the land below belonged of common right, to the King."

It is very obvious, however, that, with us, the question does not depend on the tide, or *fresh water;* that if the river has been expressly recognised as a public highway by the Federal and State Governments; or even if it be of sufficient width and depth, and suited to the ordinary purposes of navigation, and the Government has not expressly granted any part of the bed, or computed it in the quantity granted, which implies an exception, as in case of navigable water, the stream is thereby constituted a public highway, and no individual can assert any private right of soil in the bed beyond the low water mark. His claim could have no better foundation than that in the case of the *oyster bed* planted in the tide water, both places being alike reserved for public use. That this is the true character and proper view to be taken of the Coosa River, has I think been sufficiently

6Mass. R.438 439.

shewn. Therefore on this point there was no error in the instructions given below.

2. The second point involves the same principle, so that the remarks made upon the first are also applicable to this. It results from what has been said that Wilson could not sustain his title to a mill erected by himself in the bed of the river beyond low water mark. If he could not otherwise, the circumstance of his having inserted the mudsills, or any other part of the house, or dam, into the bank, so as to attach the mill to his soil, would not improve his title below the mark. Then it follows irresistibly that the fact of another having done the work can not extend his title. In either case the law could only recognise his title to so much of the building or works as came within his line. Therefore in this case the plaintiff below could have had a right to recover only so much of the mudsills, or other parts of the mill building, or appurtenances, as were actually situated within his boundary, fixing it at the *natural* low water mark. Nor could he recover these otherwise than as appurtenances to the land on which they rest, and which must pass with it in the restitution. Hence the conclusion results, that the Circuit Court erred in the instructions, that if the mill was in any manner attached to the plaintiff's bank, it was an appurtenant to his premises and included in his grant; also in ruling, that the plaintiff was entitled to recover damages for the use of it.

3. The third point is embraced and disposed of by the preceding views. It was unnecessary that the verdict should expressly except the mill.

4. The last point, involving the effect of the Legislative grant to Sawyer, under whom Bullock claims, was not intended to present any question as respects

its intrinsic validity in reference to the public. Such an enquiry would have been irrelevant to the case. The question was whether, if the mill had been erected under the authority of the act, prior to the plaintiff's purchase of the land, and he entered with a knowledge of this fact, he took subject to the nuisance, if any. On this point it is sufficient to say, the act can have no constitutional effect to deteriorate the value of the public domain, or any title or interest which an individual may at any time, either before or afterwards, have legally acquired in the same. To avoid a conflict of grants, the Legislature may be presumed to have intended no such effect. The legal view of the subject is conceived to be this, that any one intending to avail himself of the privileges contemplated by the act, must observe the maxim, *sic utere tuo, ut alienum non lædas*; and if he proceed without securing the adjacent lands, he must take upon himself the responsibility of the act, to all persons to whom injury may accrue from it. So that on this question the Court below was correct.

But on the second point, relating to the effect of attaching the mill house to the bank, the judgment below must be reversed and the cause remanded.