# JANUARY TERM.

## CHARLESTON.

### BARRE *v.* FLEMING.

Submitted January 21, 1887.—Decided February 5, 1887.

1. RIPARIAN RIGHTS—OHIO RIVER—LOW-WATER-MARK.

    The riparian proprietors of lands, bounded on the Ohio river in this State, own the fee in the lands to low-water-mark, subject to the easement of the public in that portion between the high and low-water-mark, with the right of the State to control the same for the purposes of navigation and commerce without compensation to the owner.

2. RIPARIAN RIGHTS—OHIO RIVER—WARRANTY—INJUNCTION—LICENSE.

    When land lying on the Ohio river is conveyed by deed with general warranty and calling for low-water-mark on said river as one of its boundaries, the warranty is not broken by reason of the fact that the public owns an easement therein, and she or one of her municipal corporations has perpetually enjoined the purchaser from building a wharf or private landing on the land below high-water-mark without his obtaining a license to do so.

*C. L. Brown* for appellant.

*H. C. Flesher* and *V. S. Armstrong* for appellees.

SNYDER, JUDGE:

Henrietta F. Barre and Anne L. Fitzhugh, by deed dated

May 13, 1880, conveyed to Fairman F. and George P. Flem-
ing, with general warranty of title, a certain lot of land
situate in the town of Ravenswood, in Jackson county,
described and bounded as follows:

" Beginning at a stake on the southeast side of Sand street,
between the lot of A. Callison and the river, opposite the
head of a small drain or gully that empties into Sand creek;
thence in straight line to low-water-mark on Sand creek;
thence down said creek to the river at low-water-mark;
thence up the river at low-water-mark to the lower side of
Sand street; thence with said street to the place of begin-
ning."

In consideration of said conveyance the grantees paid
down $500.00, and in addition thereto agreed to pay to the
grantors $1,000.00 in two equal payments at one and two
years with interest. A lien was retained in the deed to se-
cure the deferred payments.

The river mentioned in the deed as one of the boundaries
of said lot is the Ohio river which forms the western bound-
ary line of this State. At the time of said purchase the
grantees were, and had for more than fifteen years prior
thereto, been engaged in the business of wharfingers on the
Ohio river at the said town of Ravenswood. They were put
in possession of said lot immediately after the date of the
deed and soon thereafter they commenced the construction
and erection of a wharf and bulkhead on that part of the lot
lying between high and low-water-mark on the Ohio river
without obtaining the consent of the council of said town to
do so. Thereupon, on July 30, 1880, the said town obtained
an injunction from the Circuit Court of said county restrain-
ing the grantees from constructing any works or wharf within
the corporate limits of the town without legal authority to
do so, or in any manner interfering with the franchises
and landings of the town. This injunction was afterwards
dissolved by said court, but upon appeal to this Court the
same was on July 7, 1883, re-instated and made perpetual.
*Ravenswood* v. *Fleming*, 22 W. Va. 52.

The said Anne L. Fitzhugh died in the year 1882, after
having willed her whole estate to her sister, the said Hen-
rietta F. Barre, and a large portion of the purchase-money

for said lot remaining unpaid, the said Henrietta F. Barre, in July, 1885, instituted this suit against the said Flemings in the Circuit Court of Jackson county to enforce the lien on said lot for the unpaid purchase-money.

The defendants, in their answer, aver that they purchased said lot for the purpose of making and owning their own wharf in order that they might carry on their business within the corporate limits of the town without being subject to the large annual tax they were then paying to the town for the privilege of carrying on their business; and that the river front of said lot to low-water-mark was the material inducement to the purchase. They also aver that by reason of the decision of this Court in the aforesaid injunction suit, they have been deprived of the use and control of about one and three fourth acres of said lot, and that there is deficiency in the lot of that quantity, being the portion lying on the Ohio river between high and low-water-mark, to which the grantors had no title, of the value of $900.00, for which sum they ask an abatement on the purchase price of the lot. The Circuit Court decided and entered a. decree on November 10, 1885, that the defendants were entitled to an abatement of the purchase-money for the value of that portion of the lot lying between high and low-water-mark, and the plaintiff appealed therefrom to this Court.

There is no controversy in regard to the material facts in the cause. The land of which the said lot is a part was granted to General George Washington by the Commonwealth of Virginia prior to the year 1800. The said grant is over 100 years old, and its boundaries call for the Ohio river and running with its meanders without reservation or qualification, and the town of Ravenswood is located upon the land embraced in this grant. If the Commonwealth of Virginia retained any right, title or interest in said land or acquired any therein since the date of her grant it could be only such as may have been retained or acquired by her by virtue of her public statutes and sovereign right of eminent domain. And if the State of West Virginia or the town of Ravenswood has any such right, title or interest to any portions of the lot in controversy, it must in like manner be only such as existed in the Commonwealth of Virginia at

the formation of this State or has since been acquired or confirmed by the public laws and statutes of the State. The important question then is, what right, title or interest, if any, has this State or the town of Ravenswood in the lot in controversy or any portion of it?

It is not pretended that either has any title or control over that portion of the lot lying above ordinary high-water-mark. The only controversy is as to that portion lying between high and low-water-mark on the Ohio river.

In May, 1779, the General Assembly of Virginia passed an act establishing a general land office and prescribing the terms and manner of granting lands. This act authorizes the granting of all waste and unappropriated lands lying within the Commonwealth with certain defined exceptions, none of which included any lands in that section of the Commonwealth in which the grant to General Washington, now in question, was located. (10 Hen. Stat., ch. 13, p. 50). In May, 1780, an act was passed excepting from the operation of grants thereafter to be issued the sea-shore or the shores of any river or creek in the eastern parts of the Commonwealth which have remained ungranted, and which have been used as common to all the good people. (10 Hen. Stat. 2, p. 226). This act of course had no reference to lands west of the Alleghanies.

By an act of the Confederate Congress, passed July 13, 1787, the navigable waters leading into the Mississippi and St. Lawrence rivers, and the carrying places between the same, were made common highways, and forever free to the citizens of the United States without tax, duty or impost. The General Assembly of Virginia, on January 15, 1802, passed the following statute:—" Whereas it hath been represented to this present General Assembly, that many persons have located, and lay claim in consequence of such location to the banks, shores and beds of the rivers and creeks in the western parts of this Commonwealth, which were intended and ought to remain as common to all the good people thereof: *Be it therefore enacted*, That no grant issued by the register of the land office for the same, either in consequence of any survey already made, or which may hereafter be made, shall be valid or effectual in law to pass.

any estate or interest therein. " (2 Va. Stat. at Large, p. 317).

March 1, 1819, a general act similar to the above and applying to the whole Commonwealth was passed. (Sec. 6, ch 86, 1 Rev. Code 1819, p. 323. See also Code 1849, ch. 62, p. 326).

By an act passed Feb'y 3, 1840, the General Assembly confered upon the county and corporation courts authority to permit individuals to erect wharves at public landings and fix the rates of wharfage, provided the same should not interfere with navigation or a public landing. It also authorizes the owners of lands upon any water-course to erect piers or bulkheads in said water-courses opposite their lands, provided the same should not obstruct navigation or interfere with private rights. But it is expressly declared, that such wharf, pier or bulkhead may be abated by the County Court whenever it is satisfied that same obstructs the navigation of the stream or encroaches upon any public landing (chap. 71, Acts 1839–40, p. 57). The substance of this act was incorporated in the code of 1849. (See §§ 46 and 47, chap. 52, p. 275.)

The same provisions were incorporated in the code of this State as sections 40 and 41 of chap. 43—but by section 42, it is declared, that "Nothing contained in either of the last two sections (40 and 41) can be construed to authorize the erection of any wharf, pier or bulkhead within the limits of an incorporated town, village or city, without the consent of the council thereof. (Code of 1868, p. 276; see also sections 46, 47 and 48, chap. 194 of Acts 1872–3, p. 577.)

The town of Ravenswood was incorporated by an act of the General Assembly of Virginia passed March 10, 1852, (chap. 400, acts 1852, p. 296) ; and its corporate limits were extended by an Act of the legislature of this State passed February 25, 1868. (Chap. 51, Acts 1868, p. 47).

By the provision of the constitution of 1863, under which this State was formed, it is declared, that " The State of West Virginia shall also include so much of the bed, banks and shores of the Ohio river as was heretofore apportioned to the State of Virginia ; and the territorial rights of prop-

erty in and the jurisdiction of whatever nature over the said beds, banks and shores heretofore reserved by or vested in the State of Virginia shall vest in and be hereafter exercised by the State of West Virginia." (Art. I, sec. 2, Const. 1863.)

We have thus given the history of the legislation of Virginia and this State in relation to the property rights and jurisdiction over the bed, banks and shores of the Ohio river, and it appears therefrom, that this State is invested with all the rights and property therein that existed in Virginia at the time this State was created. It is important next to enquire what were, at that time and prior thereto, the rights and property claimed and recognized by the courts of Virginia in and to the beds, banks and shores of that class of her rivers to which the Ohio belonged.

In *Home* v. *Richards*, 4 Call 441, decided in 1798, it was held, that "The *bed* of a navigable river is in the Commonwealth and can not be granted." This decision makes no reference to the banks of such river. Where land is conveyed, which is bounded by a river or other water-course not navigable, such conveyance carries with it the title to a moiety of the bed of such river or water-course. (*Hays* v. *Bowman*, 1 Rand. 417; *Mead* v. *Haynes*, 3 Id. 33.)

In *Crenshaw* v. *The Slate River Co.*, 6 Rand. 265, it was decided in 1828, that although grants of land to individuals may include the *bed* and *banks* of rivers, yet the *public* have a right to the *use* of all such *rivers* for the purposes of navigation. It was also held in the case that the legislature might, by grants to individuals in some special cases, confer rights in opposition and paramount to this public right and use. In *French* v. *Blankhead*, 11 Gratt. 136, it was held, " That under the act, 1 Rev. Code of 1819, chap. 87, p. 341, the conveyance by the high-water-mark boundary passed to the United States the soil and jurisdiction to the low-water-mark." This case, however, being controlled by a statute relating only to the tide-water section of Virginia, cannot be treated as authority on the question now before us. This is also true as to the case of *Norfolk City* v. *Cooke*, 27 Gratt. 430.

According to the common law of England there were but

two classes of riparian owners of land : (1.) Those owning lands on tide water or waters in which the tide ebbs and flows, and these were designated navigable waters; (2.) All others were those owning lands on waters in which there was no tide, and these were designated non-navigable waters. In the first class the banks and soil under the water is in the King as *parens patriæ* or the lord of the manor, and the rights of riparian owners extends only to high-water-mark. In the second class, the King has no rights and riparian owners on either side of the stream or river owns the bed and soil *ad medium filum aquæ*. It is therefore apparent that according to the English common law the sovereign or the public had no rights in or title to the banks and bed of any fresh water river or water-course whether the same was navigable or not, but that the whole of such rivers and water-courses, including their beds and banks, belonged to the riparian proprietors owning lands adjacent thereto. This doctrine of the common law has been to some extent modified by usage and statutes even in England. This doctrine was adopted and applied in the early decisions of many of the States in this country, but it was subsequently found to be unsuited and unapplicable here on account of our great fresh water lakes and rivers. It was soon ascertained that the principles of individual appropriation could not be maintained in regard to these great water ways without great detriment to commerce and the public interest.

In order to remove these difficulties and at the same time maintain the reason of the common law rule in its general principles, the Federal and State courts of this country formed and adopted a new common law doctrine suited to the necessities and conditions of this continent. In reference to this modification of the English rule and the necessity of it, Taney, C. J., in the opinion of the court in *Genesee Chief*, 12 How. 443, 455, says : "The courts of the United States naturally adopted the English mode of defining a public river, and consequently the boundary of admiralty jurisdiction. It measured it by tide-water. And the definition having found its way into our courts, became, after a time, the familiar mode of describing a public river, and was repeated, as cases

occurred, without particularly examining whether it was as universally applicable in this country as it was in England. If there were no waters in the United States which are public as contra-distinguished from private, except where there is tide, then unquestionably here as well as in England, tide-water must be the limits of admiralty power. And as the English definition was adopted in our courts, and constantly used in judicial proceedings and forms of pleading, borrowed from England, the public character of the river was in process of time lost sight of, and the jurisdiction of admiralty treated as if it was limited by the tide. The description of a public navigable river was substituted in place of the thing intended to be described. And under the natural influence of precedents and established forms, a definition originally correct was adhered to and acted on after it had ceased, from a change in circumstances, to be the true description of public waters. * * * * It is evident, that a definition, that would at this day limit public rivers in this country to tide-waters, is utterly inadmissible. We have thousands of miles of navigable water, including lakes and rivers, in which there is no tide. And certainly there can be no reason for admiralty power over a public tide-water, which does not apply with equal force to any other public water used for commercial purposes and foreign trade. The lakes and the waters connecting them are undoubtedly public waters; and we think are within the grant of admiralty and maritime jurisdiction in the Constitution of the United States." (12 How. 457.)

It thus appears, that by this decision the definition of a navigable river was modified so as to include in that term not only those rivers in which the tide ebbs and flows, but all rivers in this country which are in fact navigable. But neither this decision nor necessarily the definition thus employed affect the rights of riparian owners of lands bordering on this new class of navigable rivers. For the determination of these rights under this American common-law we must refer to other decisions.

The common-law rule of England and for a time in this country, as before stated, was that in all such rivers the riparian proprietor owned the soil to the center of the stream.

(*People* v. *Platt*, 17 Johns. 195; *Brown* v. *Kennedy*, 5 Har. & J. 195; *Canal Trustees* v. *Haven*, 5 Gilman 548). But if the river be in fact navigable, the public has a right to use it as a highway. (*Adams* v. *Peese*, 2 Conn. 481; *Berry* v. *Carle*, 3 Greenl. 260).

In *Commissioners, &c.,* v. *Kempshall*, 26 Wend. 404, it was held by the unanimous judgment of the court of errors, that in all the rivers, above the flow of the tide, the soil to the center, and the usufruct of the water, are the property of the adjoining owners, subject, if navigable, to the public easement of navigation. This principle has, except in Iowa, been applied to the Mississippi and Ohio rivers. (*Morgan* v. *Reading*, 3 Smedes & M. 366).

In Ohio it has been adjudged, and we think correctly, that the ordinance of 1787, for the government of the North-Western Territory, which declares that the navigable waters leading into the Mississippi shall be common highways, and forever free, does not impair or abolish the common law principles, that he who owns the bank, owns to the middle of the river, subject to the easement of navigation. (2 Ohio 307; *Blanchard* v. *Porter*, 11 Ohio St. 138; 3 Kent's Com. 427, 432; *Bullock* v. *Wilson*, 2 Porter 436).

In Pennsylvania the law has been settled by repeated adjudications that in navigable streams, such as the Ohio river, the title of the riparian proprietor extends to ordinary *low-water-mark;* and in unnavigable streams to the middle. (*Wood* v. *Appal*, 63 Pa. St. 210; *Carson* v. *Blaser*, 2 Bin. 475; *Ball* v. *Slack*, 2 Whart. 508; *Tinicum, &c. Co.,* v. *Carter*, 6 Pa. St. 21.) The same rule also has been adopted in Michigan, North Carolina, Mississippi and Alabama. (*Moore* v. *Lanborne*, 2 Mich. 260; *Wilson* v. *Forbes*, 2 Dev. 30; *Commrs.* v. *Withers*, 29 Miss. 39; *Bullock* v. *Wilson*, 2 Porter 436.)

In cases of the public lands of the United States, the grantee's title to the land is considered as going only to the margin. (*Railroad Co.* v. *Shurmier*, 7 Wall. 272). But even in such grants the owner is entitled to the rights of a riparian proprietor whose land is bounded by a navigable stream, among which rights is that of access to the navigable part of the river fronting his land, and to make a landing, wharf or pier. (*Yates* v. *Milwaukie*, 10 Wall. 504.)

In *Barney* v. *Keokuk*, decided in 1876, the court says : "And since this court, in the case of *The Genesee Chief*, 12 How. 443, has declared that the great lakes of and other navigable waters of the country, above as well as below the flow of the tide, are in the strictest sense, entitled to the denomination of navigable waters, and amenable to the admiralty jurisdiction, there seems to be no sound reason for adhering to the old rule as to the proprietorship of the beds and shores of such waters. It properly belongs to the States by their inherent sovereignty, and the United States has wisely abstained from extending (if it could extend) its surveys and grants beyond the limits of high water. The cases in which this court has seemed to hold a contrary view depended, as most cases must depend, on the local laws of the States in which the lands were situated." (94 U. S. 338.) This case was from Iowa in which State the rule as to the rights of riparian proprietors is laid down differently from that of all the other States. (*McManus* v. *Carmichael*, 3 Iowa 1.)

In some of the States the decisions hold that the titles of the riparian owners whose lands are bounded by the Mississippi river extend to the thread of the stream. (*Morgan* v. *Reading*, 3 Sm. & Marso 366; *Middleton* v. *Pritchard*, 3 Scam. 510). But the more recent cases in these and other States limit the ownership of the riparian proprietor in the soil to low-water-mark. (*Ensminger* v. *The People*, 47 Ill. 384; *Bainbridge* v. *Sherlock*, 29 Ind. 364).

According to the foregoing and many other decisions, which I have examined but deem it unnecessary to cite, I think we may safely deduce the conclusion, that the title of the riparian owner of land, bounded by the Ohio river, extends at least to low-water-mark, subject to the easement of navigation, and the right of the State to control its use for the promotion of commerce. It is true, that we have no decision in this State or the State of Virginia positively defining the rights of riparian owners of land bounded by the Ohio river. In a former portion of this opinion, we have stated the legislation and decisions of the courts of Virginia on this subject. These decisions throw very little light on the question now before us, they having reference to the waters of the eastern parts of the State and some of them

under statutes having no application to the waters in that portion of the State which is now West Virginia. The only statute relating to the rivers now in this State is the act of January 15, 1802, which we have herein quoted in full. This act, while it is in terms retrospective as to surveys not then carried into grant, is not so as to grants theretofore issued and then in force; therefore, even, if this statute could be construed as denying the right to grant the banks and shores along any part of the Ohio river, which I think is doubtful, still as the grant to General Washington for the land now in controversy had been issued long before that statute was passed, it did not and was evidently not intended to divest the title vested by said grant. (*Martin* v. *Waddell*, 16 Pet. 367; *Pollard* v. *Hagan*, 3 How. 212.)

In *Ravenswood* v. *Fleming*, 22 W. Va. 52, this Court decided, that the riparian owners of land on the Ohio, as against this State, hold their titles only to ordinary high-water-mark, and that the bed, banks and shores of said river are held by this State in trust for the public. The only question involved and actually decided in that case was that the statute denying to a riparian owner of a lot, within an incorporated town the right to build a wharf, pier or bulkhead without the consent of the town-council was constitutional. A careful consideration of the opinion delivered in that case will show, that it was not intended to be decided, either that the State held the fee in the bed, banks and shores of the Ohio river below high-water-mark, or that it could authorize the taking of the fee of said bed, banks and shores for whatever purpose it might choose. On the contrary, the opinion expressly declares, that the riparian owners "have an undoubted right to the exclusive use of the banks and shores of the navigable rivers adjacent to their farms as against every stranger, who is not navigating the river or exercising some public privilege that pertains to every one in the use of a navigable stream, and that they could maintain trespass against any one who should cut trees there or who should take driftwood therefrom, or sand, gravel or earth, or who should take therefrom coal or other valuable things that might lodge thereon." (22 W. Va. 69). It is thus evident this decision recognizes the ownership of the fee in the riparian

proprietor subject to an easement in the public, which is held in trust by the State for the promotion of commerce and the regulation and protection of navigation for the general public, and that in the execution of this public trust the State may by statute confer upon her municipal corporations the right to authorize the establishment of public wharves or landings within their corporate limits without compensation to the owner of the fee. This decision, therefore, it seems to me, is entirely consistent with the law as hereinbefore deduced from the decisions of other States to the effect that the riparian owners of lands bounded by the Ohio river own the fee to the low-water-mark, subject to an easement of the public in that portion lying below high-water-mark with the right of the State to control that easement for the purposes of navigation and commerce without compensation to the owner.

In the case at bar the appellees purchased the lot in controversy, subject to this public easement, and with full notice of the public statutes enacted by the State for its control and regulation, because every citizen is conclusively presumed to know the public laws of his State and to make all his contracts with reference and in subjection thereto. The only breach alleged of the covenant of warranty in the deed to them is, that the town of Ravenswood has perpetually enjoined them from erecting a wharf or private landing beyond high-water-mark on the lot purchased by them without the consent of the council of said town. At the time they made their purchase the public laws of the State made it unlawful to erect such wharf or landing without the consent of the town council, and this public law formed a part of their contract of purchase. They can not now be heard to say, that they relied on the warranty as a guaranty that they should do a thing forbidden by law. Such a warranty would have been illegal and void in itself and no redress could be obtained for its breach. The appellees obtained the fee to all the land described in their deed. The fact that a part of the lot was subject to a public easement, which was notorious and of which they had full knowledge, does not, any more than would the easement of a public road over a portion of the lot, constitute a breach of the

covenant of warranty in the deed. In *Patterson* v. *Waters*, 9 Watts 152, the court said:—" It is fair to presume, that every purchaser, before he closes his contract for the purchase of land, has seen it and made himself acquainted with the locality and the state and condition of it; and, consequently, if there be a public road or highway open and in use upon it, he must be taken to have seen it and to have fixed in his own mind the price he was willing to give for the land with reference to the road either making the price less or more as he conceived the road to be injurious or advantageous to the occupation of the land." The law as thus declared has been fully recognized and confirmed by the decisions of this Court and the Appellate Court of Virginia. (*Patton* v. *Quarrier*, 18 W. Va. 447; *Jordan* v. *Eve*, 31 Gratt. 1).

Upon the whole case, I am of opinion for the reasons hereinbefore stated, that the appellees are not entitled to any abatement of the purchase-money by reason of the public easement in a portion of the lot in controversy, and that therefore the decree of the Circuit Court should be reversed and the cause remanded to said court for further proceedings in accordance with the principles announced in this opinion.

REVERSED. REMANDED.