# CHARLESTON.

BROWN OIL CO. *v.* CALDWELL.

Submitted January 26, 1891.—Decided March 14, 1891.

1. RIPARIAN RIGHTS—LOW WATER MARK.

Rights of riparian owners of land on the Ohio river extend to low water mark.

2. RIPARIAN RIGHTS—BOUNDARIES—LOW WATER MARK.

A conveyance of land calls "thence N., 8° W., 26 9-10 poles to a stake at Ohio river marked '1;' thence down said river S., 62° W., 81 6-10 poles, to a stake on point at mouth of French creek." The line along the river is low water mark.

3. RIPARIAN RIGHTS—BOUNDARIES—LOW WATER MARK.

This is not changed by the facts that before the conveyance actual survey was made fixing the point at I just over the river bank, and running thence a straight line to the point at the mouth of French creek, leaving a space between it and low water mark, and that a diagram representing such surveying and straight line was made, and the further fact that the deed conveying three parcels of land contains the clause: "These said calls are controlled by diagram made by R. A. G., county surveyor."

*J. G. McCluer* and *Jackson & Yeaton* for appellants, cited 11 Gratt. 149; 6 Pet. 477 (500); 13 Pick. 261; 95 N. C. 137; 1 Warv. Vend. 380; 32 W. Va. 488; 22 W. Va. 1; 72 N.

Y. 95; 6 Lans. 18; 1 N. Y. 102; 66 Barb. 347; 16 N. Y. 359; 51 N. Y. 656; 3 Wash. Real Prop. (4th Ed.) 402; 6 N. Y. 348; 66 Tex. 543.

*J. A. Hutchinson, T. I. Stealey* and *L. N. Tavenner* for appellee, cited Ang. Watt. Con. (7th Ed.) 19, 23; 12 Johns. 252; 2 Wheat. 205; 16 Me. 357; 5 N. H. 520; Taylor (N. C.) 190; 29 W. Va. 323; Hutch. Land Titles §§ 544, 547; 21 How. (U. S.) 365; 23 Wall. 46.

BRANNON, JUDGE:

On a bill presented by the Brown Oil Company against R. G. Caldwell and others to the judge of the Circuit Court of Pleasants county, an injunction was awarded restraining the defendants from constructing derricks, boring any well or entering or trespassing upon certain premises of the plaintiff described in the bill; and, the judge having overruled a motion to dissolve the injunction, the defendants appealed to this Court.

On 26th October, 1887, George Hendricks and wife conveyed to Elizabeth Jones three tracts of land, Nos. 1, 2, 3; and on 27th March, 1890, Elizabeth Jones and her husband leased said land to Joseph S. Brown, for the development of oil and he transferred his lease to the Brown Oil Company. On 14th July, 1890, George Hendricks leased to R. G. Caldwell and others, for the purpose of boring for oil, a parcel of land of about one acre, and, these lessees having entered to bore a well for oil, the Brown Oil Company obtained said injunction. Both sides claim under George Hendricks. The Brown Oil Company claims that the deed from Hendricks and wife, conveying lot No. 2, goes to low water mark on the Ohio river, leaving no opening for the subsequent lease made to Caldwell and others; while Caldwell and his co-lessees claim that the prior lease from Hendricks to Brown is next to the river bounded by a line running practically with its bank, not including its shore and beach, leaving between this line and low water mark an area of about one acre leased to them. Thus the only question we are to decide is whether the lot No. 2, conveyed by Hendricks and wife to Elizabeth Jones, ex-

tends to the low water mark of the Ohio river; for, if it does, there is no room for the land he subsequently leased to Caldwell and others, he having no title to it to confer on Caldwell and others.

The deed from Hendricks to Jones discribes lot No. 2 as follows: "Tract No. 2. Beginning at a stake on upper bank of said French creek in edge of railroad right-of-way, marked 'G' on diagram ; thence with said right-of-way N., 74° E., 31 poles, to a stake at H ; thence N., 8° W., 26 9-10 poles, to a stake at Ohio river marked 'I;' thence down said river S., 62° W., 81 6-10 poles, to a stake on point at mouth of said French creek; thence S., 28° E., 1 pole, to a stake; thence up to the creek, with its meanders, N., 80° E., 20 poles ; N., 65° E., 21 7-10 poles; N., 38° E 12 3-10 poles, to the beginning,—containing six and one half acres by survey.

Hendricks's right extended to low water mark of the Ohio river, as riparian owners of lands bounded by that river go to low water mark, subject to the easement of the public in that portion between high and low water marks. *Barre* v. *Fleming*, 29 W. Va. 314 (1 S. E. Rep. 731). I think it plain, that under the law the boundary of tract 2, as given above, carries that tract to the limit of Hendricks that is, to low water mark. We see that after leaving the Ohio River Railroad right of way the call is for N., 8° W., 26.9 to a stake at Ohio river. Where does this line stop? As the grantor's line was the low water mark, in law is it not reasonable to say that he intended to sell to the outer line when he located a corner at the river? Did he intend still to retain a narrow strip, which he could not reach except by going over the land which he sold? Of what value would it be to him? Is it reasonable that the purchaser intended to leave this strip, which would cut off all access.

Ang. Water-Courses, § 23, says: "The cases, on the whole, may be said to demonstrate the existence of the rule that a grantee bounded on a river (and it is immaterial by what mode of expression) goes *ad medium filum aquæ*, unless there be decided language showing a manifest intent to stop at the water's edge; and there seems a distinct and

strong tendency in the cases to turn every doubt upon expressions which fix the boundary next the river in favor of a contact with the water."

My examination satisfies me thoroughly that this statement of Angell is a fair and unquestionable presentation of the law. Surely, under this law, a line calling for a stake "at Ohio river" would carry us to the water of the river. In the case of the Ohio it is to low water; in case of streams not navigable, it would be to the middle of the stream.

In *Rix* v. *Johnson*, 5 N. H. 520, a call for a stake at the river made the river the boundary, and from "stake at the river" the line was said to be "on the river," and it was said to be a strong argument to show that the river was the boundary. Note to section 29, Ang. Water-Courses. Where a line ran to a stake standing on the east bank *etc.*, thence down the river, it extended to the thread of the river. A line calling easterly on a creek, and down said creek to a butternut tree, was held to place the corner in the center of the stream opposite the butternut. 1 Wait, Act. & Def. 711.

· The cases are numerous to show that this line from the railroad goes clear to the river. Thus we are at the low water mark, and we can not leave it. The next call is: "Thence down said river S., 62° W., 81 6–10 poles, to a stake on point at mouth of said French creek." Who can doubt that this expressly keeps us to the low water mark in tracing the line? A line running on or with or along a stream goes to its middle; and, even where the call is the bank of a river, it is to its middle. Ang. Water-Courses, § 24. And this river line calls for a terminus at a stake "on point at mouth of said French creek." The mouth of French creek is the Ohio; that is, it is actual, physical contact of creek with river; a confluence of their waters; their intermingling and union. This is the meaning of the expression "at the mouth of said French creek." The call for a stake, all surveyors know, is not a natural or fixed, immovable point, but we must yield distance to the natural call for the river, and be conducted to it by course or some other element to give it

location. Here the stake is "on point at mouth of said French creek." That is the point of land made by the junction of the creek and river. If we want to go to high water mark, we must go out the point only so far as to reach that mark; while, if we want to go to low water mark, we proceed on out this point until get to low water mark. In either case, we are on the point; and, as Hendricks's right went to low water mark, and we are not to assume that he intended the unusual thing of retaining a narrow inaccessible strip, or that the purchaser intended to leave this strip to exclude him from valuable river privileges, what more plausible than to say that this corner also is at low water, and that thus the river line follows the low water mark? Authorities in support of these views could be cited almost without number. *Hayes* v. *Bowman*, 1 Rand. (Va.) 417; *Mead* v. *Haynes*, 3 Rand. (Va.) 33; *Camden* v. *Creel*, 4 W. Va. 365. So, tested by the calls of the deed, it is safe to say that the river line of Hendricks's grant to Jones is the low water mark.

While I do not deem it necessary to advert to all the points of argument made for the defence, yet it is just to their claim that I should refer to a fact, on which they rely— on which, it may be said, their defence alone rests. The deed from Hendricks to Jones, after describing each of the tracts, says: "These said calls are controlled by diagram made by R. A. Gallaher, county surveyor of the county aforesaid;" and it is proven that before the deed was made, Hendricks, Mrs. Jones' husband, acting for her, and Gallaher, the surveyor, made an actual survey of this lot 2, running the line from the railroad right of way towards the river, but not to the river; and that he stopped at twenty-six and nine tenths poles, point I, which is some distance over the edge of the river bank, and some distance from the water, and ran the next line from said point, I, down to the point at mouth of French creek, and that said line is straight, and that he made a plat giving the course and distance according to the running on the ground, and this line left a strip between it and the water of the river. Counsel for appellees concede that but for the reference in the deed to this diagram the deed would go to the water, but

contend that the declaration of the deed that its calls shall be controlled by the diagram shows a contrary intent, and that the lines as shown on the plat as they were actually surveyed on the ground, and as they are short, and distance can be accurately fixed, must govern.

There is some force in this contention, but it is not sufficient to control the case. We have seen that the calls of the deed in law go to low water, and all presumptions favor the theory that the intent is to go to the water, and it must be clear that such was not the intention.

Angell on Water-Courses, § 9, states the law thus: "The only mode by which a right of property in a water-course, above tide-water, can be withheld from a person who receives a grant of the land, is by reservation directly expressed or clearly implied." § 17: "It matters not what may be the intention of the grantor of land described as being bounded by a water-course, or by words as comprehensive or in law equivalent; the grantee will hold to the thread of the river, even if such was not the grantor's intention."

Chancellor Kent in the 3d volume of his Commentaries p. 428 says: "It would require an express exception in the grant, or some clear and unequivocal declaration or certain and immemorial usage, to limit the title of the owner in such cases to the edge of the river."

In *Watson* v. *Peters*, 26 Mich. 508, it was decided that a grant of a city lot bounded on a navigable stream, with the water as a boundary, in the absence of an express reservation, conveys to the grantee to the center of the stream; and the fact that the grantor, before conveying, platted the land into lots and blocks, with distinct lines and distances marking the boundaries of each lot, and with the water boundary of the river lots indicated by a line representing the shore-line, and conveyed by such plat, will not limit the grant to such shore-line, or operate to reserve to him proprietary rights in front of the lots conveyed. Judge COOLEY said in the opinion: "The owner of city lots bounded on navigable streams, like the owner of any other land thus bounded, may limit his conveyance within specific limits, if he choose; but, where he conveys with the water

as a boundary, it will never be presumed that he reserves to himself proprietary rights in front of the land conveyed, which he may grant to others for private occupation, or so occupy himself as to cut off his grantee from the privileges and conveniences which appertain to the shore of navigable water. Such privileges and conveniences constitute a part, and in many cases the principal part, of the value of the grant. * * * The rule is too valuable and important to be varied by so immaterial a circumstance as that the boundary on the water is described by a line, instead of by making use of words which to the common understanding would convey the same meaning ; and what we have said of navigable waters is equally applicable to all water-courses. If on the face of the plat, by reference to which the defendant bought, there was anything which distinctly indicated an intent on the part of the proprietors to make this case exceptional, and to reserve to themselves any rights in front of the water lots marked on it, after they should have been sold, the case would have been different. Ang. Water-Courses, § 23, note 2. There seems to be no conflict whatever in the authorities that, where a certain distance is called for from a given point on a navigable stream to another point on the stream, to be ascertained by such measurement, the measurement must be made by the meanders, not in a straight line." Tyler, Bound. 224.

Where an exception or reservation which would cut off the grantee from the water is claimed to exist in a deed, the Maine court, in *Winslow* v. *Patton*, 34 Me. 25, has said that the doctrine pertinent to the matter is that words of doubtful import are to be construed most favorably to the grantee. See *Tyler, Bound.* 225. If the intention was in the case of this deed from Hendricks to Jones to reserve the land claimed by the defendants, how easy it would have been to except it plainly. It is difficult to say just what was meant by the language of the deed that the calls were to be controlled by the diagram. Was it intended to keep it from going to low water mark, which everybody knew to be Hendricks' line ? Why, then, did the deed call for a stake at the river, and run thence "down said river," which certainly would follow the river at low water mark?

Shall we allow this doubtful language to overthrow calls in the deed which in law would carry us to low water mark, and exclude this one acre, and cut off Mrs. Jones's land from the advantages of the stream?    I think not.

What does this language mean with reference to lots 1 and 2?    I observe that in describing lot 1 the call is from railroad land N., 8° W., 28.4, to river at A; then down the river 6 poles, to I.   I take it that the river line of lot 1 goes to low water mark.   It stops at this same letter "I" known in lot 2.   How long would the diagram last?   If lost, where could this description be found?   Shall we reject the certain calls of the deed for those of the plat, under this clause, uncertain and perishable?   It is not presumed that a party granting land intends to retain a mere narrow strip between the land sold and his line, and this is much more so when it would cut off the grantee from valuable water privileges.   *Western M. & M. Co.* v. *Peytona C. C. Co.*, 8 W. Va., 406.

There is evidence tending to show, perhaps a decided preponderance, that, when the survey was made, the husband of Mrs. Jones directed the surveyor not to include this piece claimed by defendants, saying he did not desire to pay for land which he could not cultivate, and that he directed where the line down the river should be run, and that the vendor acceded to it, saying he could utilize this small piece in tying up boats and rafts.   Hendricks says he did not intend to sell it.    Mrs. Jones and her husband say they did intend to include it in their rights, but that the agreement was that it was worth nothing for cultivation, and the consideration of the purchase being one hundred dollars per acre, she did not wish to pay for it, and the survey was made, not to limit the land from the river, but to ascertain just how much land fit for cultivation there was, so as to count its cost.   This version derives considerable support from the fact that the calls in the deed are for the river, while the lines actually run do not go to it. But there stands the deed, the repository of the agreement of the parties, conferring certain legal rights, not to be overthrown by the doubtful meaning arising from the clause of the deed that the calls were to be controlled by the plat,

and I do not think we can allow any verbal agreement such as that referred to to control the effect of the deed.

Order of circuit court overruling motion to dissolve is affirmed, and the injunction is perpetuated.

AFFIRMED.