H. T. SHANNONHOUSE ET AL. v. T. S. WHITE ET AL.

(Filed 15 September, 1915.)

**1. Trial—Issues—Submission.**

The form of issues submitted is of little consequence, if they submit the questions involved, and under them evidence is introduced by both parties presenting their sides of the controversy.

**2. Navigable Waters—Water Rights—Wharves.**

Under Revisal 1905, sec. 1696, declaring that persons owning lands on any navigable water may, for the purpose of erecting wharves, make entries of the lands covered by water adjacent to their own, the low-water mark in a navigable stream in which the sea tides do not ebb and flow is the boundary of the adjacent land, though the height of the water fluctuated according to the winds.

APPEAL by defendants from *Justice, J.,* at January Term, 1915, of PERQUIMANS.

Proceeding under the entry laws, whereby H. T. Shannonhouse and another protested against an entry by T. S. White and others. From the judgment White and others appeal.

This is a proceeding under the entry laws, tried upon these issues:

1. Is the enterer entitled to entry of any of the water front in question?   Answer: "Yes."

2. If so, how many feet east of wooden stake in protestants' western line, as claimed by protestants?   Answer: "Eight feet."

From the judgment rendered, defendants, enterers, appealed.

*Ward & Thompson for plaintiffs.*
*Charles Whedbee and P. W. McMullan for defendants.*

BROWN, J.  The defendants T. S. White and others laid an entry for wharf purposes, as prescribed by section 1696, Revisal of 1905, for a certain piece or parcel of land covered by the waters of Perquimans River, claiming that said land was adjacent to the front of a certain shore land which they owned.  The plaintiffs, protestants, duly filed protest.

T. C. Blanchard & Bro. originally owned a tract of land in the town of Hertford, extending from Grubb Street between parallel lines northwardly to the Perquimans River.  In 1906 said T. C. Blanchard & Bro. conveyed to the Supply and Development Company, subject to certain easements immaterial to this controversy, "a certain piece of swamp land 50 feet wide, extending across said lot, being 15 feet north from the center of the railroad track and 35 feet south of the center of the railroad track."

This strip of land, 50 feet wide, descended by mesne conveyances to the defendants.  The remainder of the property descended by mesne conveyances to the protestants in this cause.

The defendants contended that at ordinary high tide Perquimans River came within 15 feet of the center of the railroad track and south of the northern line of said 50-foot strip from the eastern extremity of said strip, clear across to the western extremity thereof, and that there was no land between the northern line of said strip and the margin of Perquimans River.  The defendants further contend that at normal low tide the Perquimans River came within 15 feet of the center of the railroad track and south of the northern line of said 50-foot strip for a distance extending 33 feet eastwardly from a stake in what was originally the western line of the Blanchard lot, and for that distance of 33 feet there was no land between the northern line of said strip and the margin of Perquimans River.

2—171

The plaintiffs contend that at normal low tide Perquimans River did not come within 15 feet of the center of the railroad track, or south of the northern line of said 50-foot strip, and that there was land between the northern line of said strip and the margin of Perquimans River across the whole front of said strip.

There was evidence to support the contentions of both parties, and also evidence which tended to show that at normal low tide Perquimans River came within 15 feet of the center of the railroad track and south of the northern line of said 50-foot strip for a distance extending 8 feet only eastwardly from the stake in what was originally the western line of the Blanchard lot, and for that distance of 8 feet there was no land between the northern line of the 50-foot strip and Perquimans River.

Section 1696, Revisal, provides: "Persons owning lands on any navigable sound, river, creek, or arm of the sea, for the purpose of erecting wharves on the side of the deep waters thereof, next to their lands, may make entries of the lands covered by water, *adjacent to their own,* as far as the deep water of such sound, river, creek, or arm of the sea, and obtain title as in other cases. But persons making such entries shall be confined to straight lines, *including only the fronts of their own tracts,* and shall in no respect obstruct or impair navigation."

There are two assignments of error set out and discussed in the brief of defendants, viz.:

1. The refusal of the court to submit this issue: "What portion, if any, of plaintiff's land is bounded by Perquimans River at ordinary high tide?"

2. The court charged the jury, in effect, that claimants were entitled to lay entry upon the water front to so much of said water front only as abutted and bounded their lot at ordinary low tide.

The issues submitted by the court present the questions at issue, and under them evidence has been introduced by both parties, presenting fully both sides of the controversy. The form of issues is of little consequence, if the material facts at issue are clearly presented by them. *Paper Co. v. Chronicle,* 115 N. C., 147; *Simmons v. Allison,* 118 N. C., 778. It is admitted that the Blanchards owned to and along the river. Unless the portion of the land they conveyed out of their tract, and now owned by defendants, runs to and borders on the river, then under the statute the defendants have no right of entry. The finding of the jury gives to plaintiffs a strip of land between the defendants' land and the river, with the exception of 8 feet. The jury have found that 8 feet of defendants' land borders on the river.

The case seems to turn upon what is the edge or margin of the stream. Upon this his Honor charged:

"Now, I will say to you that ordinarily, in a section where there is no navigable water, the center of the stream is what you would go to when

the stream is not navigable. Where there is navigable water, and it is affected by the daily tide, the ebb and the flow of the tide twice in twenty-four hours, then, because everybody knows where the high tide comes, and it comes there twice a day, the law is that the margin of the river at high tide governs.

"Neither one of those conditions obtains in this case. But there is another condition, and another rule. In a case like this they have, it appears from this testimony, in the Perquimans River what is known as wind tides. There is no regularity about them. They don't rise and fall daily, but a high wind from one direction will bring the water from the sound and from the mouth of the river, and back it up into the river, and make what they call a high wind tide.

"Now, it may be that you know more about that than I do. It is also true that the reverse of that proposition would be true naturally, and that a high wind in the opposite direction, or about the opposite direction, would blow the water the other way. They say that is so in this testimony. It would strike any reasonable man that that would be so. If the wind can blow the water in, an opposite wind can blow it out.

"Now, gentlemen, the court lays down this rule in a case like this: This is a navigable stream, admitted on all sides; it is navigable for seagoing vessels. A ship can get up in this river, and go from this river into the sea, as I understand it; a stream not affected by the daily tide, but affected by the wind tide. Now, isn't that about the condition that we have, according to the testimony?

"Then, the court lays down this rule to you, that what governs as the margin of the stream is what it is in low tide—naturally low tide; not a low tide brought about by some extraordinary condition of affairs, not a low tide that might come from a long blowing of the wind from the opposite direction, and blowing out the water, and making it an unusually low tide, but what is meant by a low tide is the normal low tide. That is to say, the tide that would exist if there was no condition to make it high or low—a long calm time, when there was no wind blowing from either way, and has not been; then what would be the low tide at this time is what is contemplated by the law as the low tide. You can conceive, gentlemen, and they say that that is so at this very time; the witnesses tell us that this is an extraordinary high tide, and that but few times in the knowledge of your oldest citizens has the tide been so high as it is now. The witnesses say that there have been times when the wind blew in an opposite direction, and when the tide was low, extraordinarily low, when very much of the water had been blown out of the river in the direction of the sound, and then that was an unusual condition of affairs.

"It would not do to say that that was simply low tide as contemplated by the law. The law does not contemplate the extraordinary condition

of things in a case like this at all—the extreme high tide, nor the extreme low tide—but where there is no condition that tends to make a high tide or a low tide, and you find the river at what one of the witnesses has described as a standing tide, a standing low tide is what the law contemplates."

This charge appears to us to be a clear and correct presentation of the case, and could not well have been misunderstood by the jury. It is well known that in inland rivers as far from the inlets of the sea as the Perquimans River the effect of the ocean tides is not felt. His Honor made it plain that in using the terms "low tide" and "high tide" he referred to conditions of the river brought about by winds, freshets, or other extraordinary causes, and not to the ocean tides. The sum and substance of the charge is that the jury should find from the evidence where the margin of the river was when it was in a normal condition, and then to locate the low-water line, and not to locate it at the edge of the water when much of it was blown out.

The Pamlico River, at Washington, in this State, is a navigable stream, and at that point the force and effect of the ocean tide is not usually felt. In that respect it is similar to the Perquimans River. In *S. v. Eason,* 114 N. C., 792, the question presented was the location of a boundary of the town of Washington, which ran with the Pamlico River. The Court said: "It follows, therefore, that a grant to a riparian proprietor, running with a navigable stream, such as the Pamlico River at Washington, from one designated point on its banks to another above or below on the same bank, must be so located as to extend, not *ad filum aquæ,* but only to the low-water mark along the margin of the stream."

In *Wilson v. Forbes,* 13 N. C., 30, it is held that: "A stream 8 feet deep, 60 yards wide, and with an unobstructed navigation for sea vessels from its mouth to the ocean is a navigable stream, and *its edge at low-water mark is the boundary of the adjacent land."*

This case is cited with approval in *Collins v. Benbury,* 25 N. C., 282; *Lewis v. Lumber Co.,* 113 N. C., 55.

The same rule seems to obtain in other jurisdictions. *Bullock v. Wilson,* 2 Port. (Ala.), 436; *Webb v. Demopolis,* 95 Ala., 116, 13 South., 289, 21 L. R. A., 62; *Williams v. Glover,* 66 Ala., 189; *Martin v. Evansville,* 32 Ind., 85; *Bainbridge v. Sherlock,* 29 Ind., 364, 95 Am. Dec., 644; *Hogan v. McMurtry,* 5 T. B. Mon. (21 Ky.), 181; *Schurmeier v. R. R.,* 10 Minn., 82 (Gil. 59), 88 Am. Dec., 59; *Brisbine v. R. R.,* 23 Minn., 114; *Arnold v. Mundy,* 6 N. J. Law, 1, 10 Am. Dec., 356; *Palmer v. Farrell,* 129 Pa., 162, 18 Atl., 761, 15 Am. St. Rep., 708; *Stover v. Jack,* 60 Pa., 339, 100 Am. Dec., 566; *Martin v. Nance,* 3 Head (40 Tenn.), 649; *Com. v. Garner,* 3 Grat. (Va.), 655; *Barre v. Fleming,*

29 W. Va., 314, 1 S. E., 731; *Oil Co. v. Caldwell,* 35 W. Va., 95, 13 S. E., 42, 29 Am. St. Rep., 793.

The judgment of the Superior Court is

Affirmed.