Howry, Judge,
delivered the opinion of the court:
This is a Bowman Act proceeding for the alleged taking of private property for public use. The cause was first presented without request in the pleadings for judgment. The court met the wishes of the plaintiff in that regard, as it did in the companion case of Barnes, and authorized report directly to the law-making body where proceedings began. But plaintiff was entitled nevertheless to judgment for the *674 sum found due inasmuch as the statute of limitations of six years had not begun to run when the petition was filed. Independent of the wishes of the parties, the thirteenth section of the act of March 3, 1887, 24 Stat., 505, is mandatory for the rendition and entry of such judgment as became necessary. This course would not preclude the court from making report to Congress according to law. But the result must be stated also in the form of a judgment so that the parties may obtain the opportunity to have the conclusions reviewed in the Supreme Court.
The cause of action originated in the erection by the Government of a dam across the Monongahela River 2 miles below the plaintiffs mill, by means of which the water of the river was thrown back so as to destroy the plaintiff’s milldam and render useless the mill and also the machinery, as it was then and there used, contained in the mill building. The dam and mill which plaintiff had been using before the Government undertook to improve the navigation of the river had been in use for many years. As far back as 1819 the General Assembly of Virginia had passed “An act to reduce into one the several acts concerning mills, milldams, and other obstructions to watercourses.” Under this general law, in 1849, Levi Low (under whom plaintiff derived whatsoever title or privilege there is) was authorized to increase the height of his dam, provided that the same should produce no impediment to the navigation of the river. Subsequently Thomas Hall and Raphael Hoult were authorized to erect and keep in repair necessary fixtures at their milldam on the Monongahela River. Reference to these acts appear in the findings.
The cause was first heard in connection with the case of Barnes v. U. S., 46 C. Cls., 7. The Barnes mill property was dose by the land and mill of this plaintiff. In deciding the present case we stated that the issues in Hood’s case presented substantially the same conditions as in the case of Barnes and called for an application of the same legal principles. To this statement there is exception because, it is argued, no part of the land, mill building, or machinery was rendered valueless in the Barnes case. It is further argued that the Barnes mill, after the improvement of the river, could have been operated by steam power, but that Hood *675 could not substitute steam for water power nor make use of bis mill building for tbe purposes in view when it was built.
The present issues arise on the motion of plaintiff to amend the findings and for a new trial.
The contention of the plaintiff is, first, for the value of the mill franchise; and, next, for the value of the mill building and the machinery in the mill, including water wheels and shaftings.
On these contentions the amended findings show that the alleged franchise was destroyed by the improvement, and that steam power could not be substituted for water power because it was not practicable to convert this water mill into a steam gristmill, inasmuch as there was not room enough for anything of that kind and likewise because the banks above and below were and are constantly being cut away, and when freshets occur water from the river comes up over the floor of the building.
The franchise for which compensation is claimed should be classed as a claim in the nature of an incorporeal hereditament. The privilege constituting the alleged franchise was the right to maintain for use the milldam which plaintiff acquired from his grantor. But the original grant was conditional because of the provision that the dam when constructed should produce no impediment to the navigation of the river. Whenever it appeared that the dam did in fact obstruct navigation it became, under the terms of the grant, a nuisance to be abated, not at the option of the grantee but by the courts, whenever the fact appeared to the authorities. There was nothing inheritable in such a grant, and no right of property vested in the first grantee or in any of his assigns. As we read the acts of the assembly, the original grantee constructed the dam only by permission of the State, with no obligation on the part of the public to provide compensation whatsoever whenever it became necessary for public authority to improve for better navigation. This permit was merely a license, with which the State of West Virginia undertook to make no change.
Plaintiff relies on the authority of the Monongahela Navigation Co. v. United States, 148 U. S., 312, in which it appears that the company had a charter and supplemental to that *676 charter it was provided by the Legislature of Pennsylvania that whenever the construction of sufficient locks and dams to extend the slack water on the Monongahela River from the Pennsylvania line to Morgantown, in Virginia, should be commenced it should be the duty of the navigation company to commence the construction of a lock and dam to extend the navigation. The company was given the right if they did so to collect tolls upon commerce passing through its locks. When these lóeles were taken over by the United States the court recognized the power of the State to grant the franchise. But the appellate court refused to permit the Government to so appropriate the property as to exact the same tolls as the company had been receiving, inasmuch as the State had power to grant the franchise in such way as to make it a vested right. On the facts in the case mentioned it was finally held that the navigation company rightfully placed the condemned lock and dam in the river and that it had a franchise to receive tolls for its use, because it was as much a vested right of property as the ownership of the tangible property.
Here the case is different, as the findings show. Virginia, had the right to withdraw assent for the use of the privilege at any time; and we must assume that the act reserving the right for the State inured to the benefit of the National Government under the power to regulate commerce.
The Monongahela River was and is a navigable river. It was always amenable to the admiralty jurisdiction. Nothing in the local law can be found for it ever to have been otherwise. The technical title to the bed of the river was either in the State or in the riparian owner. But the riparian claimant had no title superior to that of the State.
In United States v. Chandler-Dunbar Water Power Co., 229 U. S., 54, it was held that the flow of the stream of a navigable river is in no sense private property, leaving no room for judicial review at the instance of a private owner of the banks of the stream when Congress determined that such flow was needed for the improvement of navigation. In the case cited it appeared that Congress had declared that all of the lands and property of every kind lying north of the pres *677 ent St. . Marys Falls Ship Canal throughout its entire length and lying between the ship canal and the international line of Sanlt Ste. Marie, in Michigan, was necessary for the purposes of navigation, and acquirement by condemnation had been directed. The compensation awarded the Chandler-Dunbar Co. for its property was $652,332, of which amount $550,000 was the estimated value of water power. The Supreme Court reversed the award for the value of the water power and declared that the company was not the owner of the river or of the inherent power in the falls and rapids, but that all their rights were dependent upon the public right of navigation; that the use of the bottom of the river was proper for the purpose of placing structures in the bed of the water in aid of navigation which did not mean the taking of private property for public use. The court further declared that structures placed in the river and upon submerged land constitute such hindrances to the proper use of the river for purposes of navigation that the removal of such structures might be required and the owners forbidden the use of the river bed whenever injurious to the dominant right of navigation. According to this, if plaintiff’s mill constituted an obstruction to navigation he might have been required to remove it.
In Lewis Blue Point Oyster Cultivation Co. v. Briggs, 229 U. S., 82, it was held that the deepening, in the interest of navigation, of a channel across a navigable bay, the bed of which was used for oyster cultivation under State grants, was not a taking of the property of the lessee of the oyster beds within the meaning of the fifth amendment. The latter case reaffirmed the principles declared in the Chandler-Dunbar case and made a clear distinction between proprietary rights and estoppel. The Monongahela Navigation Co. case, supra, was rested on estoppel and not on proprietary rights at all. In fact, the owners of the lock and canal (and the franchise to take tolls), which appeared in the Monongahela Navigation Co. ease, had constructed their works on an implied invitation of Congress. The State of Pennsylvania gave the franchise after Congress had acted.
*678 There was no such franchise acquired by this plaintiff in the privilege arising out of his use of the mill dam which furnished the water power as to justify compensation.
We have seen, according to the authorities, that if any part of the mill itself constitutes such an obstruction as to interfere with or conflict with the dominant right of navigation the use of the bed of the river may be forbidden. The destruction of the property under such circumstances would not constitute a taking within the meaning of the fifth amendment.
The banks are the lines which contain a stream in an ordinary state of high water, because the nature of the banks does not generally change, although for some cause they may be temporarily overflowed. The description of what constitutes banks has been applied to the Mississippi River. In Hart v. Board of Levee Commissioners for the Parish of Orleans, 54 Fed. Rep., 559, it was said that “this definition of the banks seems to have been adopted from an early period, being the controlling direction as to what courts shall consider the bed of the Mississippi.” Viewing the exhibits derived from the two photographs (as to the accuracy of which there is no dispute), the Monongahela River is that area extending toward the center and across the river from the natural banks shown by the exhibits. If, then, the exhibits demonstrate that the mill building wholly covered the bed of the stream, does liability arise as for a taking of the mill building and the mill wheel or any other part of the machinery ?
But plaintiff claims the value of the building as a mill, with all the machinery in the mill, including the water wheels and shaftings, upon the theory that when the mill was built and the machinery installed the improvements became a part of the realty and must be valued as a part of the land.
The rule of the common law that fixtures annexed to the realty become a part thereof and subject to existing liens thereon has been held to be subject to many exceptions. Thus, in Virginia, when a corporation possessing the right of eminent domain enters upon lands necessary for its public purposes, under the deed of a mortgagor in possession, and *679 places permanent improvements thereon in good faith, it may-later condemn the interest and title of the mortgagee without being required to pay more than the value of the land without the improvements placed thereon with intent to acquire the entire title. Searl v. School District, 133 U. S., 561; 2 Lewis Em. Dom., sec. 759, 3d ed.; Consolidated Turnpike Co. v. Norfolk & Ocean Co., 228 U. S., 596.
In Hawkins Light House cases, 39 Fed. Rep., 77, it was held that the occupation of lands under navigable waters for the purpose of erecting a lighthouse thereon in aid of navigation was not a taking of private property requiring compensation, the owner’s title being, by necessary implication, subject to the use which the United States had made of it. In reviewing this case the appellate court said in Scranton v. Wheeler, supra, that whatever the- nature of the interest of a riparian owner in the submerged lands in front of his upland bounding on a public navigable river * * * was to be held subordinate to such use of the submerged lands and of the water flowing over them as might be consistent with or demanded by the public right of navigation. This doctrine was affirmed in the Lewis Blue Point case, supra, which declared that the dominant right must include the right to use the bed of the water for every purpose which is in aid of navigation. There is no qualification to be made to this language.
Turning now to the findings in this case we see that plaintiff’s mill building was adjacent to and abutted against the banks of the river. How far in feet or yards it was extended into the river does not appear. It does appear that the building was constructed over the stream and remains there. The photographs set forth as exhibits show the building to be over the stream. Taken together these exhibits, which are a part of the findings, show the rufil building abuts against the banks and rests over the bed of the stream.
It is manifest that the entire sides of the building project from the banks into the river and practically over the bed of the water. There are three windows in the mill which appear on one side, and these three windows are over the *680 water. That the building did project over the bed of the stream is further established by the fact that the mill wheel located under the mill building was flooded and, of course, for mill purposes, was necessarily placed over the bed of the stream in order to have received its head of water from the milldam.
As to the machinery there was nothing to prevent its removal by plaintiff. Nor was there any obligation on the part of the Government to so carry on its improvements as that steam for water power might be substituted and the building put to use as a different kind of mill property. The mill building itself, like the machinery, remains subject to such use as the owner may be able to make of it.
If any part of this mill building is on fast land the proof in the case does not show it. There is some proof as to the cost and value of the building and machinery as a whole, but'there is nothing to show, as stated, that any part of this property was located on the upland. The cause must be decided upon the only tangible proof before us as to the location of the mill. And in so improving the river as to back up the waters of the stream to the destruction of the water power the Government was as much in the exercise of its right to proceed without liability as if in pursuing the same object the occasion arose for public authority to demolish the obstruction. Defendants are at liberty to exercise the right to destroy the property at any time when necessary to aid full and free navigation.
With no proof whatsoever to show that the mill building was built upon the land, but that it was adjacent only to the land and abutted against the banks of the stream, it can not be considered that there was a taking of any of the plaintiff’s improvements. It is possible that the piers supporting the mill building on one side were constructed upon fast land, and if so there might be a small recovery. But the court can not assume anything about it in the absence of proof on that point.
Plaintiff is entitled to recover the value of the submerged land. Report is directed to be made to the congressional body transmitting the cause, and judgment will also be entered for $112 as the value of the property taken.