Whitaker, Judge,
delivered the opinion of the court:
This is a suit for the taking of plaintiffs’ land and for damage to plaintiffs’ coal tipple.
The plaintiff, Kelley’s Creek & Northwestern Railroad Company, is a subsidiary of plaintiff, Kelley’s Creek Colliery Company. At the time this cause of action arose the colliery company operated a coal mine in Kanawha County, West Virginia, and the railroad company was engaged in transporting the coal from the mine to a tipple at the river’s edge where it was dumped in barges and transported down the river.
The railroad company had a lease for fifty years on a four-acre tract near the-mouth of Kelley’s Creek, on which were located its terminal and a tipple. The tipple was located between Locks 3 and 4 on the Kanawha Kiver, a navigable stream. In 1934 the Marmefc Dam, which replaced Locks 3 and 4, was completed. This raised, the level of the pool about 12 feet. In anticipation of this the railroad company in part protected its land from overflow by sheet steel piling placed along the bank of the river at its tipple. This prevented its lands at the tipple from being overflowed, but about 0.459 of an acre located elsewhere was overflowed. The increase in height of the level of the pool would have rendered the old tipple useless if it had not been replaced, since it would have been partly submerged and .barges could not have gotten underneath it. This made it necessary for a new tipple to be built. Plaintiffs sue to recover for the land overflowed and also for the damage to its tipple.
The defendant admits that the railroad company is entitled to recover for any land above high watermark which was overflowed, but denies that plaintiffs are entitled to recover for the damage to the tipple.
The defendant’s right to take such measures as to it seemed proper for the improvement of navigation without liability for injury to property, except that located above ordinary *405 high watermark, is clear; Marret, et al. v. United States, 82 C. Cls. 1, 13, cert. den. 299 U. S. 545; but the parties disagree as to what was ordinary high watermark before the Marmet Dam was constructed. The plaintiffs say it was 578 feet, and the defendant says it was not less than 590 feet. The commissioner has found that it was 578 feet. We think this is correct.
The Supreme Court in Alabama v. Georgia, 23 How. 505, 515., defined the bed of the river as—
* * * that portion of its soil which is alternately covered and left bare, as there may be an increase or diminution in the supply of water, and which is adequate to contain it at its average and mean stage during the entire year, without reference to the extraordinary freshets of the winter or spring, or the extreme droughts of the summer or autumn.
Ordinary high watermark was defined by the Circuit Court of Appeals for the 8th Circuit in United States v. Chicago, Burlington As Quincy R. R. Co., 90 F. (2d) 161, 170, as follows:
The line of ordinary high water divides the upland from the riverbed. The riverbed is the land upon which the action of the Avater has been so constant as to destroy vegetation. It does not extend to nor include the soil upon which grasses, shrubs and trees grow. Harrison v. Fite (C. C. A.) 148 F. 781. Beyond that point the Government can not go without compensation for proximate damages.
This is the law of West Virginia, and is the law generally. In Union Sand & Granel Co. v. Northcott, et al., 102 W. Va., 519, 135 S. E. 592, high Avatermark was defined as follows:
* * * The high watermark is the line which the river impresses upon the soil by covering it for sufficient periods to deprive it of vegetation and to destroy its value for agriculture.
Defendant’s proof completely disregards these tests. Its sole witness on this point testified that vegetation would not in anyway influence his opinion as to where the ordinary high water-line was. tie said that he determined the high-water mark “by the gauge records and the number of open *406 river rises that occurred in the past, and to what elevation a flood would rise which had an average frequency of occurrence of one time a year.” Manifestly, his testimony is wholly without value. The high watermark is not to be determined by arithmetical calculation; it is a physical fact to be determined by inspection of the river bank. It is the line, where the water stands sufficiently long to destroy vegetation below it.
Plaintiff’s proof satisfactorily establishes as a matter of fact that the high watermark before the construction of the Marmet Dam was 578 feet above mean sea level, Sandy Hook datum. After the construction of this dam the high watermark was 590.5 feet, Sandy Hook datum.
As stated, tliis increase in the level of the pool overflowed some of plaintiffs’ land, the value of which the defendant admits it is entitled to recover if above high watermark. But defendant says, even though high watermark was at 578 feet, the plaintiffs are not entitled to recover for the value of the old tipple which was rendered useless by this increase in the height of the level of the pool.
The flooding of the 0.459 acres was not the thing that rendered • the tipple useless. Only damages which accrue as the result of a taking can be recovered. Damages that are not the consequence of the taking cannot be recovered. United States v. Grizzard, 219 U. S. 180, 183. The tipple was rendered useless not on account of the taking of the 0.459 acres, but because, after the level of the pool had been raised, the tipple would have been in part submerged and barges could not have gotten underneath it.
The tipple was supported by three piers, one of which was some distance back from the shore, another immediately on the shore, and a third in the bed of the stream, its base being at about low-water mark. The tipple projected out over the river beyond this last pier. When the level of the pool was raised, the lower part of the pier was submerged and also the lower part of the tipple. If the defendant is liable at all it is liable on this account and not on account of the taking of the 0.459 acres. *
*407 The tipple was constructed under a license issued by the Secretary of War to the colliery company giving it the right—
* * * to construct and maintain a coal tipple and ice breaker on the north bank of the Kanawha Biver, at said place, as shown on said plans, upon the following conditions:
* * % * *
2. That if at any time in the future it shall be made to appear to the Secretary of War that the structures herein authorized are unreasonable obstructions to the free navigation of said waters, said licensee will be required, upon due notice from the Secretary of War, to remove or alter the same so as to render navigation through said waters reasonably free, easy, and unobstructed.
The last paragraph read:
It is understood that this instrument simply gives permission under said Act of Congress to do the work herein authorized, that it does not give any property rights, and does not authorize any injury to private property or invasion of private rights.
Under the law of West Virginia a riparian owner on a navigable stream owns the land to low-water mark; the title to the bed of the stream beyond low-water mark toward the opposite shore is in the State; Brown Oil Co. v. Caldwell, 35 W. Va. 95, 13 S. E. 43; Barre v. Fleming, 29 W. Va. 314; Norfolk City v. Cooke, 27 Grattan (Va.) 430; but the title to the bed of the stream up to ordinary high-water mark is subject to a paramount servitude in favor of the United States authorizing it to take all necessary and propel' steps in the interest of navigation. Gibson v. United Statesr 166 U. S. 269, 272; Scranton v. Wheeler, 179 U. S. 141, 163; Philadelphia Co. v. Stimson, 223 U. S. 605, 635, 638; Greenleaf Lumber Co. v. Garrison, 237 U. S. 251, 259; United States v. Chandler-Dunbar Co., 229 U. S. 53, 62, 63; New Jersey v. Sargent, 269 U. S. 328, 337.
It follows from this that any structure erected in the bed of a stream is erected there at the peril of him who erects it. It is erected there with knowledge, actual or constructive, that the Government in the improvement of naviga *408 tion may so raise high-water mark as to destroy or impair the utility of the structure. If so, the owner has no redress. It is damnum absque injuria. Many hard cases have arisen, but in them and in others the courts have consistently held to this view. Hood v. United States, 49 C. Cls. 669, 678-680; Union Bridge Co. v. United States, 204 U. S. 364, 373, 388-389, 399-400; United States v. Chandler-Dunbar Co., sufra; Lewis Blue Point Oyster Co. v. Briggs, 229 U. S. 82; Greenleaf Lumber Co. v. Garrison, 237 U. S. 251, 260; United States v. Chicago, Milwaukee, St. Paul & Pacific E. Co., 113 F. (2d) 919, 312 U. S. 592.
In United. States v. Chandler-Dumbar Co., sufra, the respondent, by permission of the Government, had erected a power plant on the St. Mary’s River, with dams, walls, and dikes in the bed of the river. The United States, in order to improve navigation, proposed to divert a portion of the water in this river into a canal to be constructed parallel with its banks. Prior thereto it instituted condemnation proceedings to condemn respondent’s property. The lower court gave the Chandler-Dunbar Co., a judgment for $652,332, of which $550,000 was the estimated value of the waterpower of the river. In valuing the upland taken it included a value for its use in connection with the development of waterpower. The plaintiff claimed it was entitled to damages of $3,450,000. The Supreme Court in an elaborate opinion by Mr. Justice Lurton held that plaintiff was not entitled to recover for the value of the waterpower and that it was entitled to recover only for the value of its upland, without regard to its value connected with the development of waterpower. In the course of its opinion, on page 70, the court said:
* * * That riparian owners upon public navigable rivers have in addition to the rights common to the public certain rights to the use and enjoyment of the stream which are incident to such ownership of the bank, must be conceded. These additional rights are not dependent upon title to the soil over which the river flows, but are incident to ownership upon the bank. Among these rights of use and enjoyment is the right, as against other riparian owners, to have the stream come to them substantially in its natural state, *409 both in quantity and quality. They have also the right of access to deep water, and when not forbidden by public law may construct for this purpose, wharves, docks, and piers in the shallow water of the shore. But every such structure in the water of a navigable river is subordinate to the right of navigation, and subject to the obligation to suffer the consequences of the improvement of navigation, and must be removed if Congress in the assertion of its power over navigation shall determine that their continuance is detrimental to the public interest in the navigation of the river. Gibson v.. United, States, 166 U. S. 269; Transportation Co. v. Chicago, 99 U. S. 635. * * *
In United States v. Chicago, Milwaukee, St. Paul & Pacific R. Co., supra, the Railway Company had constructed its road along the banks of the Mississippi River. It was assumed by the court for the purpose of its decision that, at four places there were embankments, the bases of which were located below ordinary high-water mark. The top of the embankments and the tracks were above ordinary high water. In the course of the improvement of the Mississippi River, Lock and Dam No. 5 was built which raised the ordinary high-water mark. The railroad claimed the right to recover for the value of that part of its submerged embankments which were above the ordinary high-water mark. In the opinion of the Circuit Court of Appeals, reported in 113 F. (2d) 919, 921, the issues were thus stated:
The appellees disclaimed any damage to their properties from the raising of the level of the river to its ordinary high-water mark, but contended that, under the law, they were entitled to compensation for the damage to their properties caused by the flooding of the railroad embankment above ordinary high-water mark, without regard to whether it was located on lands above or below that level.
The District Court had “ruled that the Government had the right to flow the appellees’ embankment and structures up to ordinary high-water mark without incurring liability to pay compensation; but that, since the embankment and structures did not interfere with navigation, the Government would be' liable for damages caused by the flooding above ordinary high-water mark.”
*410 In the Circuit Court of Appeals the Government contended “that it has the right, in aid of navigation and without payment of compensation, to take or destroy property in the river bed; that this right extends to all property lying between the ordinary high-water marks projected horizontally from shore to shore; that the right of the United States thus to take or destroy property in the river bed without paying compensation includes those portions of such property which are situated above the ordinary high-water mark and extends to intangible riparian rights, including the right to the natural level, width and flow of the stream.”
The Court of Appeals held on the authority of United States v. Lynah, 188 U. S. 445, and United States v. Cress, 243 U. S. 316, that the railroad company was entitled to •compensation measured by the cost of strengthening and protecting the railroad embankments so as to make them safe for use at the higher level of the river created by erection of the dam.
In its brief in the Supreme Court the Government took the same position it had taken in the Court below, to wit, that it was liable for any of the upland above high-water mark which had been.taken, but that it was not liable for any property taken above high-water mark, the base of which was in the bed'of the stream. This was contrary to the decision of the Supreme Court in the case of United States v. Lynah, supra.
The Supreme Court overruled the Lynah case and reiterated what it had many times said before, that “any structure is placed in the bed of a stream at the risk that it may be so injured or destroyed; and the x-ight to compensation does not depend on the absence of physical interference with navigation.”
We think this case, as well as the others cited above, is decisive of the case at bar, and we hold that plaintiffs are not entitled to recover for the loss of use of the old tipple.
Plaintiffs in this case can hardly complain of the application of the doctrine of these cases, since the structure was erected in the bed of the stream on condition that the Secretary of War might require its removal or alteration if it should become an obstruction to navigation. The free and *411 easy navigation of this river required the raising of the level of this pool. This tipple stood in the way of this being done, if the Government would have to pay for the destruction or impairment of its utility. Under the conditions of the license, therefore, the Secretary of War had the right to require that it be removed or altered. Plaintiffs built it with knowledge of this right in the Secretary.
As we said above, the railroad company is entitled to recover the value of its upland which was submerged. This value we find to be $92.00.
The commissioner has also found that there was 0.172 of an acre periodically overflowed, the leasehold value of which he found was $50.00. The testimony supporting this finding is not altogether satisfactory. It is the testimony of Garland D. Tuggle, who was the land appraiser employed by the United States Engineer’s office at Huntington, West Virginia. He states that there was 0.172 of an acre which was subject to periodic overflow. He does not say how often it overflowed, or the effect of the overflows, but he does say that the acreage has been “damaged that amount, $52.00 for that portion,” which is the total value of the land as fixed by him. He was introduced by the Government and we, therefore, take it to be true that these periodic overflows in fact did destroy the value of this land. This being true, plaintiffs are entitled to recover the amount of $52.00 on this account. Jacobs v. United States, 290 U. S. 13, 16, and cases there cited.
[Ey the erection ef the steel sheet -pihngy land having a easeheld value ef ffiSteOh was saved free* overflew This the plaintiffs are alse entitled te recovery pinoo the eest ef the -p-iling far exceeded this valuer]
The commissioner has also found that there has been no damage to moorage rights. The plaintiffs take no exception thereto and we also have found this to be a fact.
On the whole case plaintiffs are entitled to recover the sum [ef $í9Qt00t] $144.00. Judgment therefor will be entered. It is so ordered.
MaddeN, Judge- LittletoN, Judge-, and Whaley, Chief Justice, concur.
Jokes, Judge, took no part in the decision of this case.
*412 ON MOTION TOR A NEW TRIAL ON FEBRUARY 7, 1944
Whitakee, Judge,
delivered the opinion of the court:
In its motion for a new trial defendant says the court erred in holding that plaintiffs were entitled to recover the value of their lands that would have been overflowed had they not erected sheet piling to protect it.
We entered judgment for two tracts which plaintiffs did not protect and which were actually overflowed. Defendant does not object to this, but says plaintiffs are not entitled to recover for lands not actually overflowed, although they would have been had the piling not been erected.
This seems a strange result to reach. Plaintiffs could have protected its lands which were actually overflowed, but they chose not to do so. For these they can recover; but they cannot recover for lands which would have been overflowed, but which were not in fact, because plaintiffs spent money to keep them from being.
It is, however, the necessary conclusion to be reached, because liability is predicated upon a taking and not upon damages .to property. Gibson v. United, States, 166 U. S. 269. The Constitution says private property may not be “taken” without just compensation, but makes no provision for repayment of expenses incurred to prevent a taking.
In United States v. Lynah, 188 U. S. 445, overruled on another point by United States v. Chicago, Milwaukee, St. Paul, & Pacific RR. Co., 312 U. S. 592, the court approved the decision in Mills v. United States, 46 Fed. 138, holding that there could be no recovery where the taking could have been prevented at a reasonable expense. This was also held in Manigault v. Springs, 199 U. S. 413, 484-485. See also Southern Pacific Co. v. United States, 58 C. Cls. 428; affirmed by the Supreme Court without opinion, 266 U. S. 586.
We, therefore, must hold that plaintiffs are not entitled to recover the sum of $556.00, the value of the land protected from overflow by the erection of the sheet piling.
Defendant’s motion for a new trial is granted. The conclusion of law and judgment heretofore entered are vacated and withdrawn, and a new conclusion of law now filed enter *413 ing judgment for plaintiffs in the sum of $144.00, the former findings and opinion as herein modified to stand. It is so ordered.
Madden, Judge; and Littleton, Judge, concur.
Jones, Judge; and Whaley, Chief Justice, took no part in the consideration of this motion.