**Walter M. GOLLATTE, et al.,**
**Plaintiffs,**

v.

**C.E. HARRELL, Jr., et al., Defendants.**

**Civ.A. No. 85–1403–B.**

United States District Court,
S.D. Alabama, S.D.

April 19, 1989.

Thomas R. Boller and Edward J. Vulevich, Jr., Asst. U.S. Atty., Mobile, Ala., for plaintiffs.

Harlon W. Turner, Chatom, Ala., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BUTLER, District Judge.

This non-jury declaratory judgment action was instituted by the plaintiffs (some of whom were later added) against the Harrells and the United States and the United States Army Corps of Engineers, (who were later realigned as plaintiffs) seeking a declaration of the navigability of Lewis Creek, a tributary of the Tombigbee River in southwest Alabama.

### Findings of Fact

1. The Court has jurisdiction of this matter pursuant to 28 U.S.C. § 2201 and 28 U.S.C. § 1331 as the question of whether Lewis Creek is a navigable waterway of the United States or falls within the navigational servitude of the Tombigbee River is a federal question.

2. The individual plaintiffs are citizens of southwest Alabama who claim primarily

to traverse Lewis Creek for commercial fishing. The Court finds from the evidence however, their use is limited to those occasions when the level of Lewis Creek is raised by the influence of the flood waters of the Tombigbee River.

3. The United States and the United States Army Corps of Engineers, realigned plaintiffs, claim in their answer to have "determined that Lewis Creek was a navigable water of the United States as defined in 33 C.F.R. § 329.4 and pursuant to § 10 of the Rivers and Harbors Act of 1899". The Court finds that in fact no such determination was made, but rather a Corps employee, Arthur Hosey, only ascertained that the reach of Lewis Creek he had examined in the field was below the ordinary high water mark of the Tombigbee River. He made this finding based primarily on field observations standing at the Southern Railroad trestle crossing Lewis Creek on two occasions, near the west end of the defendants' property, and examination of topographic maps, and one trip by boat on February 6, 1987 when the level of Lewis Creek was raised by the influence of floodwaters of the Tombigbee River. Actually according to Hosey's testimony, and the Court so finds when he made his boat trip, he was actually navigating on the backwaters or high waters of the Tombigbee River that had flooded over the bed of Lewis Creek. The Corps made no "determination of navigability" of Lewis Creek as that term is defined in 33 C.F.R. § 329, et seq. (See Esp. § 329.14).

4. The defendants C.E. Harrell, Jr. and Sidney Harrell are landowners through which the stretch of Lewis Creek flows that is in issue here. The creek flows from west to east through their property located in Sections 5 and 6, Township 4 North, Range 1 East of Washington County, Alabama.

5. Lewis Creek is formed by a number of sources to the west of the defendants' property, e.g., springs, other small creeks, and runoff from the upland pine forest land of Washington County, Alabama. As it meanders eastwardly toward the Tombigbee River the creek enters the defendants' property just west of the Southern Railroad trestle and progresses southeastwardly until it enters a wider area of the creek known as Harrell's Landing, a small pool of water. At the east end of this pool the main body of Lewis Creek turns northward, branches out into a number of unidentifiable fingers, and works its way eastward and then southward through a swamp to near a body of water known as Three Rivers Lake. However, there is another exit from Harrell's Landing which flows more southeasterly as it leaves the pool. This is a man-made ditch which was constructed some time prior to 1904 in an attempt to accommodate the floating of logs from a sawmill located south of Harrell's Landing and on another owner's property. This ditch was constructed in an effort to render Lewis Creek capable of floating logs, when in fact, it had been incapable of so doing prior to that. The defendants' father had signed an agreement with one S.R. Cochran, the owner of a sawmill (Defendant's Exhibit 4) to allow Cochran to use the ditch, and a dam that Cochran had already constructed, for a period of six years. (There is no evidence whether this prior construction was with or without permission). The agreement recites that Cochran could not sublease the rights and privileges granted and his use of the dam and ditch would not "interfere with ... Harrells ... in their enjoyment of the rights of landlord." The dam has long since collapsed and fallen into disrepair and the ditch was never successfully used by Cochran or anyone for floating logs. The ditch in places is no more than several feet wide, is dammed up by beavers in numerous places, has fallen trees and logs throughout its course, and in many places is shallow enough to wade across. Before the remnants of this ditch reach its eastern terminus near the head of Three Rivers Lake, it exits the defendants' southern property line and traverses lands of persons not parties to this litigation. Although this ditch is not truly the original Lewis Creek, it has been referred to throughout this litigation as Lewis Creek and the Court's ruling will accordingly address the question of its navigability.

6. The eastern part of Washington County, in which the Harrells' property is located, abuts the Tombigbee River and primarily consists of hardwood riverbottom lands. In this area of Southwest Alabama there is a dry season and a wet season. The dry season generally begins in the latter part of March and continues until the latter part of December, whereas the wet season generally begins in the latter part of December and continues until the latter part of March. During the wet season, from December to March, the waters of the Tombigbee River periodically overflow its banks and flood the bottomland area. These bottomlands consist primarily of hardwood forests, with commercially valuable stands of tupelo gum, cypress, wild pecan, willow, hickory and various types of oaks—all of which are species of terrestrial, rather than aquatic, plant life. These kinds of trees will grow on bottomland that is subject to intermittent flooding, but, with the exception of some stands of cypress and tupelo gum, will not survive on land that is permanently flooded or land that is covered by water more often than it is free of water. During the dry seasons, the Harrells have used the bottomlands for hunting deer and turkey; and growing and harvesting timber and in years past, for grazing cattle and hogs.

7. Although the regulations speak of navigable waters as including those that "have been used in the past or may be susceptible for use to transport interstate or foreign commerce," (33 C.F.R. 329.4) it is important to note, and the Court so finds, that the original course of Lewis Creek as it exited the Harrells' Landing pool to the north was never used, and was never susceptible for use to transport commerce. The dam was constructed to divert the waters that flowed down the original course of Lewis' Creek into the man-made ditch. The Court finds however that this ditch proved to be unsuccessful as a means of transportation of logs and thus was not capable then or now of supporting commerce.

8. The Court finds that as it flows through the defendants' lands, Lewis Creek is a small, narrow, shallow, obstructed, partially dry creek that is incapable of any type of waterborne commerce. It only becomes capable of use for such commerce, and not more than 25% of any given year, when the flood waters of the Tombigbee River break out of their banks on the main course of the river and back up across the intervening lands of others into the nonnavigable bed of Lewis Creek, making it only temporarily, unpredictably, available to be navigated by small outbaord motor powered boats, as the plaintiffs have testified some of them have used.

9. Three Rivers Lake is a lake into which several streams or creeks empty, including Lewis Creek. It is primarily a backwater lake of the Tombigbee River into which it empties several miles further downstream from where Lewis Creek enters the headwaters of Three Rivers Lake.

10. The Tombigbee River is a major navigable waterway of the United States, the main course of which was declared navigable by the Corps of Engineers in 1871. Congress has, throughout the years ever since, appropriated monies for navigation improvements within the main course and bed of the river, and in recent years authorized the connection of the Tombigbee Rivers' headwaters in Mississippi to the Tennessee River in what is now known as the Tennessee–Tombigbee Waterway. The Tombigbee River is a river with well defined high banks within which the low water always flows. These high banks are evidenced by the undisputed testimony of the witnesses and the contour elevation lines on Government Exhibit 4A. The closest the westernmost bank of the main course and bed of the Tombigbee River comes to the easternmost part of the defendants' property, through which Lewis Creek flows, is approximately two and a quarter miles. In between the main course of the Tombigbee and the defendants' property lies the hardwood riverbottom, which is the hardwood timberlands into which the overflow flood waters of the Tombigbee River periodically reach. These floods, and their duration and extent are unpredictable except that they generally occur, if they do at all, during the winter, or wet months,

December through March. When a major flood occurs, the flood waters can and do temporarily inundate a substantial portion of all the hardwood riverbottom lands depicted in Government's Exhibit 4A, which riverbottom land encompasses approximately 90% of the lands depicted on Exhibit 4A, or approximately 58 square miles of riverbottom lands. These floods may last as briefly as only a few days and then the waters recede and return to within the banks and bed of the Tombigbee River. When this overflow occurs, the Tombigbee flood waters back up through these adjacent riverbottom lands, and depending on their volume and duration, can flood the area around Lewis Creek, as the flood waters push their way westward out of the banks and bed of the main course of the Tombigbee River as far west as the defendants' westernmost property line which is approximately three miles from the bank of the Tombigbee. It is the effect these flood waters have on Lewis Creek that is the subject of this litigation, for the Court finds that absent their influence, Lewis Creek is not a navigable waterway of the United States.

11. The Corps Chief of the Jurisdiction and Enforcement Section of the Regulatory Branch, Art Hosey's assessment of navigability, although perhaps faulted from an administrative standpoint, led nevertheless to causing his chief, Clay Carter to write the plaintiff Gollatte a letter on July 13, 1984, (Government Exhibit 7) that the navigable waters of the Tombigbee water "extended laterally to ... include all the land and waters below the ordinary high water mark." Carter's letter went on to conclude, that "this reach of Lewis Creek (between the bridge abutments under the railroad trestle) is a navigable waterway of the United States up to the Southern Railroad bridge", because it was "below the ordinary high water mark of the Tombigbee River." This letter falls far short of a determination of navigability required by 33 C.F.R. § 329.14 and accordingly requires this Court to make a ruling on the question of navigability of Lewis Creek without benefit of the "substantial weight" to be given a properly founded Corps determination (33 C.F.R. § 329.14)

12. Hosey's explanation of his assessment that Lewis Creek fell below the ordinary high water mark of the Tombigbee River and was therefore navigable, was based on a number of factors, such as visual evidence of debris and water stains from the Tombigbee's back water, presence of water tolerant species of trees, and other biological evidence. The Government introduced a chart compiled from data compiled by Geary McDonald, a hydrology engineer with the Corps. (Government's Exhibit 10). This chart demonstrated that the ordinary high water mark identified by Hosey from the visible debris and stain line very closely approximated the level of water of the Tombigbee River, known as a flow duration line, at least 25% of the year. This "25% flow duration" line according to the Government is an average based on several decades of Tombigbee River gauge data gathered by the Corps and represents that amount of water which can be expected to flow down the Tombigbee River 25% of the year. Hosey, on re-direct examination, stated that 1986 and 1987 were dry years and the Court finds from all the evidence that this 25% flow duration is not reached in some years, and is not a accurate measurement of the ordinary high water mark of Lewis Creek. Correspondingly, 75% of the year, on the average, the waters are below these flow levels. The Court finds, however, that although that may be the average, there have been years in the recent past where the amount of water in the Tombigbee never reached that duration, and never influenced the level of the water in Lewis Creek on the defendants' property. Without the influence of these flood waters, Lewis Creek, is not now and never has been capable of bearing waterborne commerce and is not navigable in fact.

13. The plaintiffs however, also contend Lewis Creek is navigable because of what it calls the "lateral extent doctrine" under which federal regulatory jurisdiction under § 10 extends "laterally to the entire water surface and *bed* of a navigable water body" (33 C.F.R. § 329.11(a)). But this lateral

extension of jurisdiction is not without its limits. First of all, the limiting scope is spelled out in some detail in § 329.11(a) of the Corps regulations. For instance, such jurisdiction "extends to the *edge* ... of all such water bodies." On non-tidal rivers, as the Tombigbee is at this point, the ordinary high water mark is "the line on the *shore* established by ... a natural line impressed on the *bank* ..." (§ 329.11(a)(1)). The Court finds that there are portions of the Tombigbee River several miles upstream from the Lewis Creek area, at the Fred T. Stimpson sanctuary for instance, where the ordinary high water mark is in fact within the banks of the main course of the Tombigbee River. (Government Exhibit 4(a)); however the plaintiffs would apply a wider measure to the extent of the limits of the Tombigbee's navigability where, near Lewis Creek for example, either through backing up through Three Rivers Lake or overflow of the lower Tombigbee riverbottom lands, the same water that impresses its ordinary high water mark on the bank of the Tombigbee River within its main navigable course, extends up through Three Rivers Lake to and across the property of the defendants' over two and a quarter miles from the nearest bank of the main course of the Tombigbee River.

14. The Corps regulations also provide some insight into what evidence or factors to look for in determining the ordinary high water mark, e.g., a clear, natural line impressed on the bank; shelving; changes in the character of the soil; destruction of terrestrial vegetation; and the presence of litter and debris. (33 C.F.R. § 329.11(a)(1)). The evidence in this case regarding such facts was, at best, inconclusive. Hosey testified mainly about debris on the railroad trestle and a stain line on trees, but not on the bank of Lewis Creek. The defendants however, countered with evidence that there were certain types of terrestrial vegetation along the banks of Lewis Creek below that line which the Corps has ascertained to be the ordinary high water mark. In any event, this Court finds that there was not sufficient evidence anywhere on the defendants' property that it was sufficiently inundated by the high water mark of the Tombigbee River to cause Lewis Creek to become navigable.

## CONCLUSIONS OF LAW

■ The question of navigability is a federal question and thus has traditionally been defined by decisions of the federal courts. *Utah v. United States*, 403 U.S. 9, 91 S.Ct. 1775, 29 L.Ed.2d 279 (1971). The rule can be traced back to *The Daniel Ball*, 77 U.S. (10 Wall.) 557, 19 L.Ed. 999 (1871), in which the Supreme Court held that navigable in law means navigable in fact. Rivers are

> navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water. And they constitute navigable waters of the United States within the meaning of the acts of Congress, in contradistinction from the navigable waters of the States, when they form in their ordinary condition by themselves, or by uniting with other waters, a continued highway over which commerce is or may be carried on with other states or foreign countries in the customary modes in which such commerce is conducted by water.

*Id.* at (10 Wall.) 563. Although applicable on its face only to rivers, the above-stated test for navigability actually applies to all watercourses. *Utah v. United States*, 403 U.S. at 11, 91 S.Ct. at 1776. The extent and manner of use of a navigable watercourse is not important as long as it is usable as an actual avenue of commerce. *United States v. Utah*, 283 U.S. 64, 82, 51 S.Ct. 438, 443, 75 L.Ed. 844 (1931).

■ The rule of navigable in fact, though unchanged, has been refined over the years. In *United States v. Appalachian Electric Power Co.*, 311 U.S. 377, 61 S.Ct. 291, 85 L.Ed. 243 (1940), the Supreme Court described three ways that navigability may be established: (1) present use or suitability for use; (2) suitability for future use with reasonable improvements; or (3) past use or suitability for past use. Recent disuse due to the development of alterna-

tive modes of transport or artificial obstructions will not alter a watercourse's historical navigable status. "When once found to be navigable, a waterway remains so." *Appalachian Electric*, 311 U.S. at 408, 61 S.Ct. at 299.

■ Navigability also is not destroyed because a watercourse is interrupted by occasional natural obstructions or portages, nor need navigation be open at all seasons of the year, or at all stages of the water. *Economy Light & Power Co. v. United States*, 256 U.S. 113, 122, 41 S.Ct. 409, 412–13, 65 L.Ed. 847 (1921). However, susceptibility of use as a highway for commerce should not be confined to "exceptional conditions or short periods of temporary high water." *United States v. Utah*, 283 U.S. at 87, 51 S.Ct. at 445. The condition of the watercourse should be such as to ordinarily assure regularity and predictability of usage. As stated by the U.S. Supreme Court in *United States v. Holt State Bank*, 270 U.S. 49, 56, 46 S.Ct. 197, 199, 70 L.Ed. 465 (1926), rivers are "navigable in fact when they are used, or are susceptible of being used, in their natural and ordinary conditions ..." Hence, "[t]he mere fact that logs, poles, and rafts are floated down a stream occasionally and in times of high water does not make it a navigable river." *United States v. Rio Grande Dam & Irrigation Co.*, 174 U.S. 690, 698, 19 S.Ct. 770, 773, 43 L.Ed. 1136 (1899). Similarly, "the mere capacity to pass in a boat of any size, however small, from one stream or rivulet to another, ... is [not] sufficient to constitute a navigable water of the United States. *Leovy v. United States*, 177 U.S. 621, 20 S.Ct. 797, 44 L.Ed. 914 (1900). In sum, navigability is basically a question of fact to be determined from the particular circumstances of each case. *United States v. Utah*, 283 U.S. 87, 51 S.Ct. at 445.

Here, the plaintiffs offered no proof that Lewis Creek is navigable because of its suitability for future use with reasonable improvements—the second test for determining navigability established by the Supreme Court in *Appalachian Electric*. Consequently, the first and third tests for determining navigability are the ones that concern the court here.

■ The evidence adduced at trial demonstrates that Lewis Creek, in its natural and ordinary condition, is not used nor is it capable of being used as an avenue for trade or commerce. The Creek is impassable by even the smallest boat from the point where it crosses the Southern Railroad on the defendant's property to the point where it empties into Three Rivers Lake, except during periods of extremely high water, which do not occur with any degree of regularity and only last when they occur for relatively short periods of time. These periods of high water occur when the water level of the Tombigbee River rises to such an extent that the adjoining bottomlands, through which Lewis Creek meanders, flood. During these periods of high water, the banks of Lewis Creek are themselves covered with water, and at places it is difficult to follow the run of the Creek because it is not clearly discernible from other open areas of the bottomlands. The navigational obstacles encountered on Lewis Creek during periods of ordinary water range from such obstructions as fallen timber, beaver dams and sandbars to places at which the Creek itself becomes so shallow or so narrow as to prevent passage by boat at all. At the present time, Lewis Creek is not a stream over which, in its ordinary condition, trade and travel can be or is being conducted in the customary modes of trade and travel on water. Its present use for any purposes of transportation is exceptional, and only in times of temporary high water caused by flooding of the Tombigbee River. One of the defendants' own witnesses testified that at such a time he had removed hogs by boat that had been trapped by the floodwaters. The width, depth and ordinary flow of water of the Creek, absent the influence of the River, is simply insufficient to render it navigable in fact.

The evidence adduced at trial also demonstrates that Lewis Creek was never used nor was it ever capable of being used in the past as an avenue for trade or commerce. In its original state, Lewis Creek did not

connect with Three Rivers Lake to form a continuous waterway to the Tombigbee River. At one time on property that is presently owned by the Harrells, the Creek turned back north and eventually branched into numerous small fingers, which, in turn, dissipated in the bottomlands. Around the turn of the century, a sawmill called Cochran Lumber Company was located south of the Creek and east of the Railroad on another owner's property. During this period, Cochran Lumber Company constructed a ditch from the point where the Creek in its natural state turned back north to a point just west of where the Creek empties into Three Rivers Lake. The purpose of the ditch was to make possible what had hitherto been impossible: the floating of timber down the Creek from its mill to the River. This effort, however, proved unsuccessful and ultimately was abandoned because even with the construction by Cochran Lumber Company of a lock or damn located roughly where the ditch began, there never was an adequate supply of water to float the lumber down the Creek, except in times of unusually high water, which did not occur with sufficient regularity to justify using the Creek as a means to transport timber in any form. For this reason, Cochran Lumber Company ultimately moved its mill north of the Creek and west of the Railroad right-of-way in order to have easy access to transport by rail. In short, Lewis Creek was never regularly used to transport timber; nor has it ever been suitable for such use even with the improvements made by Cochran Lumber Company.

The nation's navigable waters have always been considered "public property," and since the early days of the nation have been under the exclusive control of the federal government under the commerce clause of the Constitution. *Gilman v. Philadelphia,* 70 U.S. (3 Wall.) 713, 724–25, 18 L.Ed. 96 (1865). The general scope of the government's navigational servitude has been explained by the Supreme Court as follows:

> This power to regulate navigation confers upon the United States a "dominant servitude," [citation omitted] *which extends to the entire stream and the stream bed below ordinary highwater mark.* The proper exercise of this power is not an invasion of any private property rights in the stream or the lands underlying it, for the damage sustained does not result from taking property from riparian owners within the meaning of the Fifth Amendment but from the lawful exercise of a power to which the interests of riparian owners have always been subject.

*United States v. Rands,* 389 U.S. 121, 123, 88 S.Ct. 265, 267, 19 L.Ed.2d 329 (1967) (citations omitted) (emphasis added). Clearly the scope of the lateral extent of the reach of the navigation is the entire stream and the stream bed below the ordinary high water mark. None of the witnesses in this case ever suggested that Lewis Creek was either part of the stream or stream bed of the Tombigbee River. The United States in this case simply attempts to expand the lateral extent of the navigation servitude of the Tombigbee River, by extending the reach of the ordinary high water mark as it leaves the stream and its bed during times of flooding. The decisions of the Supreme Court make clear that the navigational servitude cannot be extended by such means. For example, in *United States v. Chicago, Milwaukee, St. Paul & Pacific Railroad,* 312 U.S. 592, 61 S.Ct. 772, 85 L.Ed. 1064 (1941), the Supreme Court rejected the railroad's claim seeking compensation for damage to its railway embankments, which was caused by raising the river's water level to improve navigation, because they were located within the bed of the river. *Id.* at 598, 61 S.Ct. at 776. *See also Greenleaf Johnson Lumber Co. v. Garrison,* 237 U.S. 251, 35 S.Ct. 551, 59 L.Ed. 939 (1915) (no compensation for removal of private wharf located in bed of navigable waterway); *West Chicago Street Railroad v. Illinois,* 201 U.S. 506, 26 S.Ct. 518, 50 L.Ed. 845 (1906) (no compensation for removal of tunnel passing under bed of navigable stream); *Chicago, Burlington & Quincy Railway v. Illinois,* 200 U.S. 561, 26 S.Ct. 341, 50 L.Ed. 596 (1906) (no compensation for re-

moval and replacement of private bridge across bed of navigable river).

Consequently, the question to be determined here is what constitutes the boundaries of the "bed" of a navigable river, the determination of which will also define the scope of the government's navigational servitude applicable to the Harrell's property. In the *Chicago, Milwaukee* case, the Supreme Court defined the bed of a river as—

> "that portion of its soil which is alternatively covered and left bare, as there may be an increase or diminution in the supply of water, and which is adequate to contain it at its average and mean stage during the entire year, without reference to the extraordinary freshets of the winter or spring, or the extreme droughts of the summer or autumn."

312 U.S. at 596, 61 S.Ct. at 775 (*quoting Alabama v. Georgia*, 64 U.S. (23 How.) 505, 515, 16 L.Ed. 556 (1860)). Also, in the case of *Oklahoma v. Texas*, 260 U.S. 606, 43 S.Ct. 221, 67 L.Ed. 428 (1923), the Court stated:

> When we speak of the bed [of a river], we include all of the area which is kept practically bare of vegetation by the wash of the waters of the river from year to year in their onward course, although parts of it are left dry for months at a time; and *we exclude the lateral valleys which have the characteristics of relatively fast land, and usually are covered by upland grasses and vegetation, although temporarily overflowed in exceptional instances when the river is at flood.*

*Id.* at 632, 43 S.Ct. at 225 (emphasis added).

Section 10 of the Rivers and Harbors Act, pursuant to which the Corps seeks to assert regulatory jurisdiction over the Harrell's property, does not use the words "ordinary high-water mark." After the passage of the Act, the Corps apparently adopted the ordinary high-water mark ("OHWM") as a self-imposed jurisdictional boundary. *See* 33 C.F.R. § 329.11 (1987). That this occurred is not surprising. As shown above, the OHWM traditionally has been the line that establishes the limits of the government's navigational servitude.

*U.S. v. Rands*, 389 U.S. at 123, 88 S.Ct. at 266–67.

Although the Supreme Court has long regarded the OHWM as the exclusive factor in establishing the limits of the government's navigational servitude, it has never precisely defined the term. Nonetheless, the term "ordinary high-water mark," albeit not readily susceptible to a uniform and precise definition, is generally regarded by the federal courts "as a concept which denotes the point at which the bed of a lake or river ceases and the shore or fast lands begins, a point which may be capable of proof by a variety of methods depending upon the facts and circumstances of the particular case." *United States v. Cameron*, 466 F.Supp. 1099, 1111–12 (M.D.Fla.1978).

In discussing the OHWM, the Court of Claims in *Goose Creek Hunting Club, Inc. v. United States*, 518 F.2d 579, 583, 207 Ct.Cl. 323 (1975) stated:

> Judicial decisions indicate that the ordinary high-water mark can be variously defined—*e.g.*, as the line where the water stands sufficiently long to destroy vegetation below it (*Kelley's Creek and Northwestern R.R. v. United States*, 100 Ct.Cl. 396, 406 (1943)); or as the line below which the soil is so usually covered by water that it is wrested from vegetation and its value for agricultural purposes destroyed (*Harrison v. Fite*, 148 F. 781, 783 (8th Cir.1906)); or as the line below which the waters have so visibly asserted their dominion that terrestrial plant life ceases to grow and, therefore, the value for agricultural purposes is destroyed (*Borough of Ford City v. United States*, 345 F.2d 645, 648 (3rd Cir.1965), *cert. denied*, 382 U.S. 902, 86 S.Ct. 236, 15 L.Ed.2d 156); or as the line below which the soil is kept practically bare of vegetation by the wash of the waters of the river from year to year in their onward course (*State of Oklahoma v. State of Texas*, 260 U.S. 606, 632, 43 S.Ct. 221, 67 L.Ed. 428 (1923)).

In *Goose Creek*, the landowner owned property adjacent to Goose Creek, a non-navigable stream, which flowed into a navi-

gable river, which, in turn, flowed into another navigable river on which the government had constructed a dam. Prior to construction of the dam, the property adjoining Goose Creek was used by the landowner for hunting and grazing cattle. In addition, the trees growing along the banks of the creek had commercial value. After completion of the dam, however, the property bordering Goose Creek became permanently flooded. In determining that the landowner was entitled to compensation for the permanent flowage easement, the court held that the property adjoining Goose Creek was not subject to the government's navigational servitude covering the beds of the two navigable rivers into which it flowed, because such property was situated beyond the beds of those rivers. 518 F.2d at 583. Alternatively, the court held that even if Goose Creek were considered to be a navigable stream (a point which the government did not prove), the landowner nonetheless would be entitled to compensation, since the strips of land adjacent to the creek were above the ordinary high-water mark of Goose Creek under any of the definitions stated above. *Id.* at 584.

Like the stream in *Goose Creek,* Lewis Creek is not subject to the government's navigational servitude because it is not located within the "bed" of the Tombigbee River as that term has been defined by the Supreme Court. The lowland river bottomland through which the Creek flows is covered with grasses, trees and other terrestrial vegetation, and is only temporarily overflowed by the waters of the Tombigbee River in occasional instances when the river is at flood stage. Here, the evidence is uncontroverted that the waters of the Tombigbee River have not occupied the lowland bottomland area abutting Lewis Creek long enough to destroy all terrestrial plant life and render the land valueless for agricultural purposes. Hence, the plaintiffs have failed to meet their burden of proof in establishing that Lewis Creek is below the OHWM of the Tombigbee River. Moreover, even assuming that Lewis Creek is navigable in fact, the plaintiffs offered no proof as to the OHWM of the Creek itself.

To accept the "definition" of OHWM advanced by plaintiffs in this case, is to recognize no horizontal limits to the "bed" of a navigable river in those areas where the banks are relatively low and flat as they are along the Tombigbee River at the mouth of Three Rivers Lake. The consequences of any such rule, if applied to our navigable rivers and inland lakes, would be untenable. Any such definition of OHWM, as the line establishing the government's navigational servitude, is simply not appropriate to inland freshwater rivers and lakes, which are subject to irregular periodic rises, causing them to overflow their natural banks. In such cases, the effect of the water upon vegetation must be the principal test in determining the location of the OHWM, as the line delimiting the government's navigational servitude. This is so because there must also be horizontal limits to the "bed" of a navigable river; otherwise, the navigational servitude would extend in all directions to the lateral extent of the flood waters of any navigable river. *Cf. Owen v. United States,* 851 F.2d 1404, 1410 (Fed.Cir.1988). The vegetation test employed by the court in *Goose Creek* establishes those limits, and the Plaintiffs have offered no persuasive reason why the test should not apply here.

Although not providing an express definition of horizontal limits of the "bed" of a navigable stream as it applies to the navigational servitude, Supreme Court precedent has implicitly limited the range of the navigational servitude to the land beneath and within the stream's high-water mark. In recognizing that there are limits to the horizontal scope of the servitude, the Court has stated:

> Since the privilege or servitude only encompasses the exercise of this federal power with respect to the stream itself and *the lands beneath and within its high water mark,* the Government must compensate for any taking of fast lands which results from the exercise of the power. This was the rationale of *United States v. Kansas City Life Ins. Co.* 339 U.S. 799, 94 L.Ed. 1277, 70 S.Ct. 885 [1950], where the Court held that when a navigable stream was raised by the

Government to its ordinary high-water mark and maintained continuously at that level in the interest of navigation, the Government was liable "for the effects of that change [in the water level] upon private property *beyond the bed of the stream.*" 339 U.S., at 800, 801 [70 S.Ct., at 886, 886].

*United States v. Virginia Electric & Power Co.,* 365 U.S. 624, 628, 81 S.Ct. 784, 788, 5 L.Ed.2d 838 (1961) (emphasis added). The Court in *Kansas City Life* allowed recovery for damages to land located on a non-navigable tributary of the Mississippi River resulting from the artificial maintenance of the Mississippi at its high-water level. The land was located one and one-half miles from the river on the non-navigable tributary. The raised water level in the river also raised the local water table which blocked the drainage of the affected parcel's surface waters, thereby causing the destruction of the land's agricultural value. Since the land, not in the bed of a navigable stream, was not burdened with the navigational servitude, the Court held that a taking had occurred. 339 U.S. at 802–03, 70 S.Ct. at 887. Similarly, Lewis Creek is outside the bed of the Tombigbee River and therefore unaffected by the navigational servitude. Thus, the jurisdictional reach of the Corps under Section 10 of the Rivers and Harbors Act does not extend as far as the Harrell's property.

██ As the Court has determined that Lewis Creek is a non-navigable stream, then the question whether the public—in this case the individual plaintiffs—have a right of access to Lewis Creek during the periods of flooding by the Tombigbee River. Originally enunciated in *Pollard v. Hagan,* 44 U.S. (3 How.) 212, 11 L.Ed. 565 (1845), the doctrine of equal-footing accords newly admitted states the same rights, sovereignty and jurisdiction as the original thirteen states possess within their respective borders. *Pollard* held that under the equal-footing doctrine, new states, upon their admission to the union, acquire title to the lands underlying navigable waters within their boundaries. In *Oregon ex rel. State Land Board v. Corvallis Sand & Gravel Co.,* 429 U.S. 363, 378–82, 97 S.Ct.

582, 590–93, 50 L.Ed.2d 550 (1977), however, the Supreme Court held that where waters are not navigable or have become navigable after the time the state was admitted to the union, the equal-footing doctrine does not apply, and therefore state, not federal, law controls riparian ownership.

In Alabama,

[t]he state owns the bed and bottom of navigable streams ..., but not those which are non-navigable. The latter constitutes a part of the public land ceded to the United States April 24, 1802, ... surveyed and patented by the government as such, by which the title passed to the patentees and their successors in ownership, and is conveyed by the description of the land through which the streams run, *and thereby the public have no right of fishery in the waters as they go through such land.*

. . . . .

The owner of such land undoubtedly has the exclusive fishing rights in non-navigable streams running through it. *Hood v. Murphy,* 231 Ala. 408, 165 So. 219, 220 (1936) (citations omitted) (emphasis added); *see also City of Birmingham v. Lake,* 243 Ala. 367, 10 So.2d 24 (1942). Thus, as the court has determined that Lewis Creek is a non-navigable stream, the individual plaintiffs have no right to fish it or navigate it during times of flooding absent permission from the Harrells.

It is therefore ORDERED, ADJUDGED and DECREED that the reach of Lewis Creek through the Defendants' property is not a navigable waterway of the United States, nor is that reach within the navigational servitude of the navigable waters of the Tombigbee River. Accordingly, neither the plaintiffs, nor the public, have any right of access to, over or across that reach of Lewis Creek.